## THE INDIA.

### THE INDIA AND OWNERS v. DONALD et al.

*(Circuit Court of Appeals, Fifth Circuit. December 7, 1891.)*

1. DEMURRAGE—"WEATHER WORKING DAYS."
    The term "weather working day," when used in a charter-party, means a day, otherwise a working day, when the weather will reasonably permit the carrying on of the work contemplated.
2. SAME—COMPUTATION OF LAY-DAYS.
    "Three clear working days'" notice, required by a charter-party to be given by the master to the shipper before lay-days commence, does not begin to run until such notice reaches the shipper.
3. SAME—EXCEPTION IN CHARTER-PARTY—DROUGHT CLAUSE.
    A charter-party of a vessel at Limerick chartered to proceed to Ship island, there to load with lumber, provided that the shipper should be allowed a certain number of days "to deliver the cargo," and that in the computation of lay-days "shall be excluded any time lost by reason of quarantine, drought, * * * or any extraordinary occurrence beyond the control of the shippers." The custom of the port was to collect and prepare cargoes at Moss Point, between which place and Ship island no drought can affect communication. *Held,* that the exception in case of drought did not apply to previous droughts in the streams down which the lumber is floated, making a scarcity in the market and preventing the securing of a cargo as required. *Paterson v. Dakin,* 31 Fed. Rep. 682, distinguished.

Appeal from the District Court of the United States for the Southern District of Mississippi.

Libel by Donald Bros. & Co. against the Norwegian bark India for damages for failure of her master to give a clear bill of lading. Judgment for libelants, and dismissing cross-bill for demurrage. The owners appeal. Reversed.

*J. D. Rouse* and *Wm. Grant,* for appellants.

*R. T. Ervin,* for appellees.

Before PARDEE, Circuit Judge, and LOCKE and BRUCE, District Judges.

LOCKE, District Judge.   This vessel, the owners of which are appellants herein, being at Limerick, was chartered to appellees, Donald Bros. & Co., of Mobile, to proceed with dispatch to Pensacola or Ship island, at the option of charterers, there to load with sawn timber or boards, as the shipper might direct.   The terms of the charter-party, as far as necessary to a determination of the questions in this case, are:

"The shippers shall supply, if legal, and if required by the master, a deck-load, to consist (at shippers' option) of sawn timber and or deals and or boards at full freight.   The cargo shall be delivered along-side vessel, at her ordered loading berth, at shippers' risk and expense; the master giving shippers a written notice of three clear working days before cargo is required, after vessel being at her ordered loading berth. * * * Eighteen weather working days shall be allowed the shippers in which to deliver the cargo along-side of vessel at port of loading, which is understood to mean actual 'delivery of cargo along-side,' and not 'completion of loading,' and the cargo to be unloaded with all customary dispatch at port of discharge.   Ten like days shall be allowed on demurrage at the rate of 4d. per ton register per day.   For all such like days as the vessel may be wrongfully detained after such demurrage days, damages for detention shall be paid at the rate of 4d. per ton register per day.   Any demurrage or damages for detention shall be settled at the place where incurred.   In the computation of lay-days at port of loading shall be excluded any time lost by reason of quarantine, drought, flood, storms, strikes, fire, or any extraordinary occurrence beyond the control of the shippers.   The master shall sign shippers' bills of lading as presented, without prejudice to this charter-party, but any difference in freight shall be settled on signing bills of lading."

The ship, having arrived at Ship island under the charter-party, December 25, 1890, discharged ballast, and the master reported as ready to receive cargo, mailing the letter giving notice the 14th January, 1891. This letter it appears from the evidence was received at 9 o'clock the morning of the 16th January.   The vessel remained taking in cargo as delivered along-side until March 6th, when she completed her loading. The charterers and shippers presented a clear bill of lading for the master to sign, but he, considering and claiming that his ship had been detained beyond the legal lay-days, and that he was justly entitled to demurrage, refused to sign such clear bill of lading; whereupon a libel was filed, alleging that owing to storms and high winds and stormy bad weather the number of weather working days of the shipper were never exhausted; that storms and high winds and bad weather affected the points where the libelants had under the custom of the port collected and prepared the cargo; and that they were by these causes prevented from delivering the cargo within 18 consecutive days subsequent to the notice; but that these causes were wholly beyond their control, and they had delivered the cargo within the first 18 weather working days, and that the master had refused to sign a clear bill of lading, but had protested against said clear bill of lading, which had destroyed its negotia-

bility, and the salability of the cargo, greatly to their damage.    To this the owners of the vessel, appellants, filed a cross-libel, alleging that the lay-days, the 18 weather working days allowed by the charter, expired on the 12th of February, and that their vessel had been wrongfully detained, and that there was due them for 10 days' demurrage and 8 days' detention the amount of $1,162.    In answer to this cross-libel, appellees alleged that "in the computation of lay-days there shall be excluded any time lost by reason of quarantine, drought, floods, storms, strikes, fire, or any extraordinary occurrences beyond the control of shippers; and that, owing to droughts, storms, and floods, they were unable to have their timber delivered at Moss Point, the port where or from which the cargo is ordinarily delivered to Ship island, and that owing to said circumstances, which were wholly beyond their control, they were excused from sooner delivering said cargo."    They also denied that, owing to the condition of the weather from the 16th January to the 6th March, the 18 weather working days had expired at the time the delivery of the cargo was completed.    Upon these pleadings, the case being heard, judgment was found for libelants for one cent and costs, and the claimants' cross-libel was dismissed, with costs, from which the claimants have appealed.

Besides the question of demurrage, other questions arose in the court below, as to certain minor claims of the master of the vessel, for an amount paid as quarantine fees; for damage for breaking a knee of the vessel; and for a difference in exchange; but none of these have been assigned in error, and they will receive no consideration.    There appears to be much uncertainty in the allegations of the libelants both in the libel and the answer to the cross-libel as to what condition of facts was to be relied upon; whether droughts, storms, or floods; and whether, according to the allegations of the libel, it was to be understood that the cargo was collected at Moss Point, and they were prevented from delivering it, or, according to the answer to the cross-libel, they were unable to collect it there; but, taken in connection with the evidence, there are plainly presented two questions for examination: Whether there were more than 18 weather working days between the time when the lay-days commenced to run (three clear working days after notice by the master) and the final delivery of the cargo; and, if so, whether such time should be excluded from the time subject to demurrage under the eighth article of the charter-party.

The term "working day" has so entered into commercial language and received judicial construction that its force and meaning is beyond a question or doubt.    It has ceased to be an ambiguous phrase; but when the expression is further modified or limited by the word "weather" we find the new combination not so general in its use or so well established in its force; but its construction, and the manner and connection of its use, can permit but one meaning, namely, a day, otherwise a working day, when the weather would reasonably permit the carrying on of the work contemplated.    In this case the kind of work contemplated was towing timber in rafts or lumber on lighters and delivering it along-side

of vessel. This is an exceptive term, withdrawing from ordinary working days certain days in which it is claimed that one is unable to work, and the burden of proof is upon him who alleges the exception. The presumption is that every working day is a day in which work may be done, and he who alleges to the contrary takes the affirmative.

Upon the question of the number of weather working days which elapsed between the master's notice and the completion of loading, several witnesses have testified generally to the bad character of the weather during the months of January, February, and March, but their testimony is so uncertain and conflicting that it cannot be relied upon in determining any question of any particular day. Jackson, employed at one of the mills, says the weather for those months "was dull, heavy, and a little rainy; windy also, and foggy." Chambers, foreman of stevedores, thought the weather "unusually severe." Danzler, a lumber merchant, states generally that "it was very bad weather." The captain reported "bad weather so thick and foggy they could not do anything." "There is not much wind when there is a fog." Howze, also a lumber merchant, says: "My recollection is the weather was rainy and foggy. I don't remember anything about high winds." "As for towing timber, foggy weather is better than any other." Hearin, manager of the Pascagoula Lumber Company, says: "It was blowing, rainy, and foggy; a great deal of fog."

There were 5 days marked "stormy" by the records of the signal office of Mobile, and 7 upon which the wind reached at some time during the day 20 miles an hour. There were 46 days from the beginning of the lay-days until the vessel had completed loading, and it may have been that the weather was generally bad during the time, and yet there have been 18 or more days in which work may have been carried on; and the only way to arrive at a satisfactory conclusion is to examine the testimony touching each individual day in question. The first question is, when did the lay-days begin? The charter-party provided that the master, when his vessel was fully ready, should give three clear working days' notice. This notice cannot be considered as given until it is shown to have reached the shipper. This the evidence shows was at 9 o'clock, forenoon of Friday, the 16th February. It was not received so that Friday could be considered a clear working day, and Saturday, Monday, and Tuesday must be allowed, and the lay-days considered to have begun on Wednesday, the 21st. This is the first day in question, the master of the bark claiming it a weather working day, and libelants not admitting it. Martin, who is engaged in the lumber business at Mobile, and who had kept a record and presented an exhibit of the weather working days for the entire time in question, says "it was a heavy rain." Donald, in his diary, says it was "a wet day; strong S. W. wind. No lay-day." Rudolph, the managing man for Keyser & Co., a lumber shipping firm at Moss Point, the nearest point to where the bark was lying, and who had kept a regular record of the weather working days, which he presented, does not call it a weather working day. The signal service record at Mobile has it marked "stormy," and shows that the south-

west wind reached 30 miles an hour. This certainly cannot be counted as a weather working day.

Carefully examining the several days in dispute claimed by the claimants, and not allowed by libelants, in the light of the testimony of Martin's, Rudolph's, and the signal service records, libelant Donald's diary, and the bark's log-book, we have arrived at the conclusion of fact that the 21st, 28th, 29th January, and the 3d of February, were not weather working days, and the 2d, 6th, 7th, 12th, 21st, 23d, 24th, and 25th of February, not allowed by libelants, were weather working days, and should be allowed as such. These days, together with those allowed by libelants or classed as good in Donald's diary, make 22 weather working days to this time, deducting from which the 18 lay-days allowed, leaves 4 days for which demurrage should be allowed. It appears that the cargo, excepting the deck-load, was delivered along-side the vessel February 25th, at which time it is found that there had been 22 weather working days. The charter-party provides that this time allowed for delivering cargo "shall mean actual delivering of the cargo along-side, and not completion of loading." This would therefore complete the furnishing of cargo, all except the deck-load, as far as the shippers could be held responsible. The language of the charter-party also shows conclusively that it was the ship's duty to take cargo on board, one provision of it being "the vessel shall discharge barges and railroad cars sent along-side without unreasonable detention." The shippers, having furnished on the 25th all the cargo so far called for, were no longer chargeable with demurrage until notified by the master that a deck-load would be required. The deck-load was only to be furnished if required by the master, and the shippers were entitled to a notice of three clear working days for this. This notice was received by the shippers at 2 o'clock Saturday, February 28th. The three clear working days would be Monday, Tuesday, and Wednesday of the next week, or the 2d, 3d, and 4th of March. The deck-load was furnished on the 6th. There being no question but what the 5th and 6th were weather working days, they must be held to be subject to demurrage, which makes six days in all for which the vessel is entitled.

This brings us to the second question in the case,—are these six days to be excluded in the computation of lay-days as time lost by reason of quarantine, drought, flood, storms, strikes, or fire, under the exceptions of the eighth article of the charter-party? The evidence shows that the libelants had no cargo collected at Moss Point, but that they had to procure it from the lumbermen as they could. There have been no allegations or evidence of quarantine, drought, flood, strikes, fire, or any extraordinary occurrence happening since the computation of lay-days commenced; and the days of storms have already been excluded in considering the weather working days; but it is claimed that this clause applies, not only to the time lost during the running of the lay-days, but to previous droughts, which had for months before caused low water in the streams from which the logs were usually received, and had therefore produced a scarcity in the market, so that libelants lost time in pro-

curing cargoes as required. Such construction of the terms of the charter-party would result in so different a relation between the shippers and ship-owners, in regard to the duties of the former in supplying cargoes, from what has been fully established by law and in all commercial transactions touching the matter, that it cannot be accepted without the most conclusive and convincing argument.

First, let us consider the language of the contract. The sixth and eighth articles are to be read together. "Eighteen weather working days shall be allowed the shipper to deliver the cargo;" and "in the computation of lay-days shall be excluded any time lost by reason of drought," etc. Shall this be read that any time that may have been previously lost, or that any time lost by any drought which may have previously existed, shall be computed and excluded from the running days? or shall the words "to procure and" be interpolated before the "to deliver?" The term used, "excluded," instead of what might have been used, "deducted," does not favor such construction. Is there anything that requires it? The case of *Paterson* v. *Dakin*, 31 Fed. Rep. 682, is relied upon by libelants in the position taken by them. In this case the question appears to have been carefully considered, and the learned judge to have arrived at the conclusions therein stated upon two grounds: *First*, a desire to give force to every term used; and, *secondly*, to construe the contract according to the peculiar usages of the port of loading, as they appeared in that case. It is claimed that unless the term "drought," as here used, can be applied to droughts existing throughout the states from which lumber is supplied, causing the low water which prevents obtaining logs, it can have no force or operation in this contract, as no drought could affect the waters over which the delivery of cargo between Moss Point and Ship island was made. This may be true, that no drought could affect the delivery of cargoes at Moss Point any more than quarantine, fire, or strikes have affected the case; but it is not shown that the ship-owners were aware of that fact at the time of making the charter. We recognize the general principle that, where a construction may be given a contract which will give force to every term and provision of it, it should be done; but such construction must be reasonable, just, and consistent with well-established law and the apparent intention of the parties. In construing charter-parties, which are almost always made upon prepared and printed forms, and into which terms and conditions are introduced to cover every case which might arise, it is impossible to give force and operation to every term so used in every case, and come within this rule of construction. The intention of the parties is the principal point to be aimed at, and it is to be looked for as well in the surrounding circumstances and usage of general and local trade as in the language. It appears by the allegations of both the libel and answer to the cross-libel that it was the custom and usage of the port to have timber cargoes collected and prepared at Moss Point, where, as the libel asserts, libelants had, "under the custom of the port, collected and prepared the said cargo," and in the answer to the cross-libel they "were unable to have their timber delivered at Moss Point, the port where or

from which cargo is ordinarily delivered to Ship island." This being the customary point at which to have cargoes collected and prepared, can it be held, for the purpose of giving force and operation to the term "droughts," that the forests of the back country are to be considered as the store-houses of the cargoes, the points from which the delivery begins, and the owner to assume the risks and uncertainties of getting them to market?

It is urged in behalf of libelants that it was well known that the timber of the contemplated cargoes came from the head-waters of the rivers, and that frequently droughts prevented getting it down the streams to the mills, where it was prepared for shipment, and that it should be presumed that the charter-party was made with that knowledge, and the drought clause should therefore be held to apply. We do not think so. Such construction would completely revolutionize the law of shippers and ship-owners; make the ship-owner responsible for what was plainly the duty of the shipper; excuse the shipper of grain for the detention of a vessel at New Orleans on account of seasons of drought on the wheat-fields of the north-west, and the shipper of coal from Philadelphia for strikes months before in the coal mines of Pennsylvania of which the shipper had knowledge at the time of chartering a vessel in Liverpool. It cannot be assumed that the ship-owner assumed such risks and responsibility without the most direct and unequivocal language in the charter-party. In the case of *Hudson* v. *Ede*, L. R. 2 Q. B. 566, the shipper was excused only because, according to the custom of the port of Sulinam, the grain was stored higher up the river at Galatz, and on account of ice it could not be brought down; but in this case the custom is shown to be the other way,—that cargoes are to be collected and prepared at Moss Point.

In *Grant* v. *Coverdale*, L. R. 9 App. Cas. 470, cited by appellants, it is said:

"There is no contract as to the particular place from which the cargo was to come, no contract as to the particular manner in which it was to be supplied, or how it was to be brought to the place of loading, and that, therefore, it could not be supposed that the parties were contracting about any such thing." "It cannot be denied that unless those words of exception, according to their proper construction, take this case which has happened out of the demurrage clause, the mere fact of frost, or any other thing, having impeded the performance of that which the charterer, and not the ship-owner, is bound to perform, will not absolve him from the consequences of keeping the ship too long."

It is true that in that case the term "loading" was directly used, but in the present case the language of the section relied upon would, we consider, as strongly confine the loss to the exclusion of those days which were lost in delivering, not in procuring. In that case the loading was prevented because the ice prevented bringing the iron through the canal to the dock, but the cause was considered too remote to excuse the shipper. In this case the same reason holds with more force. The libelants themselves show that the custom of the port is that cargoes are collected and prepared at Moss Point, between which place and Ship

island no drought can affect communication. Can it be reasonably presumed that in making such charter the owners were aware of the fact that the term could have no force unless it was extended to the woods of Louisiana, Alabama, or Mississippi, and intended to take the chances of a drought there? We are clearly of the opinion that no such intention can be presumed from the language of the contract; general custom and usage is directly opposed to such construction; and we find nothing in local custom or usage to demand it.

This precludes the examination further as to whether it has been proven that it was the drought that caused any loss of time to the shippers in this particular case. The charterers (the libelants) were loading some 10 vessels at Mobile and several others at Ship island. It appears that they were loading ships at Mobile, Pensacola, Horn island, and Ship island; that from January to the time of taking the testimony they had loaded at Ship island alone some eight or nine, taking between five and six million superficial feet of lumber; that as a rule they kept a very large stock in the booms at Mobile; that the Pascagoula Lumber Company had in their booms on the 1st of January a good many more than 5,000 logs,—the manager would not say quite 10,000, but a good many over 5,000. Was it a scarcity of timber or an excess of vessels? Was it the drought and low streams or scarcity of lumber and lumbermen in the forests to supply such an active demand? None of these things appear, and it certainly cannot be presumed that the ship-owner contracted against all of these exigencies.

We do not consider that the shipper was excused for the delay of the vessel on account of any of the exceptions of the eighth article, and find, therefore, that, at the time of refusal of the master to sign clear bills of lading as demanded of him, there was an amount of demurrage due him which he had a right to demand should be settled at the place of loading, or for which he had a lien upon the cargo, and he was fully justified in such refusal, and the libel should be dismissed with costs. We further find that, under the cross-libel, the libelants, Donald Bros. & Co., as charterers of the bark India, are indebted to the owners in demurrage for 6 days, or £79 12s., at the rate of $4.83½, or $384.87, for which judgment would follow, with costs; and it is ordered that the cause be remanded by said district court, with instructions to dismiss said libel, with costs, and enter judgment for the claimants on the cross-libel for $384.87, and costs, together with the costs of this appeal.