SIXTEEN HUNDRED TONS OF NITRATE OF SODA v. McLEOD.

(Circuit Court of Appeals, Ninth Circuit. April 2, 1894.)

No. 117.

1. SHIPPING—CHARTER PARTY—DEMURRAGE—RESTRICTIONS ON LIABILITY.
    A charter party which makes the charterer liable for demurrage only when caused by his default does not relieve him of liability for delay caused by his omission to perform his covenants, even though he is not guilty of negligence.

2. SAME—POLITICAL OCCURRENCES.
    A charter party provided for demurrage for detention of the vessel by default of the charterer excepting detentions caused by political occurrences. *Held*, that political occurrences which prevented the charterer from procuring a cargo, but did not prevent him from loading any cargo he might procure, did not relieve him from liability for demurrage. Ross, District Judge, dissenting.

Appeal from the District Court of the United States for the Northern District of California.

Libel by McLeod against 1,600 tons of nitrate of soda for demurrage. Libelant obtained a decree. The owners of the cargo appeal.

Page & Eells, for appellant.

Andros & Frank, for appellee.

Before McKENNA and GILBERT, Circuit Judges, and ROSS, District Judge.

GILBERT, Circuit Judge. On the 16th day of September, 1890, the British ship Dunstaffnaage, then on a voyage to a South American port, laden with lumber, was chartered to J. W. Grace & Co., merchants of San Francisco, to bring nitrate of soda "from a

safe nitrate port, as ordered by charterers, to San Francisco, Cal., direct." The provisions of the charter party which are material to be considered upon this appeal are as follows:

"The said parties of the second part (J. W. Grace & Co.) do engage to provide and furnish the said vessel during the voyage aforesaid with a full cargo, say, nitrate of soda in bags, to be received by the vessel as customary, freight to be paid on the right and full delivery of cargo at the final port of discharge at and after the rate of five dollars U. S. gold coin per ton of 2,240 pounds avoirdupois, English weight, delivered. The said parties of the second part shall be allowed for the loading and discharging of said vessel at the respective ports aforesaid as follows: Thirty working lay days, to commence 24 hours after her inward cargo or her unnecessary ballast is finally discharged. * * * And for each and every day's detention by default of said parties of the second part, or their agents, they agree to pay to the said party of the first part demurrage at the rate of four pence sterling per ton register per day; but, should the vessel be detained by the master beyond the time herein specified, demurrage shall be paid to charterers at the same rate and in the same manner. * * * The cargo shall be received and delivered within reach of the vessel's tackle. Penalty for nonperformance of this agreement, the estimated amount of freight. The act of God, enemies, political occurrences, fire, and accidents beyond charterers' control, as well as the dangers of the sea and navigation always excepted."

The vessel arrived in due course at Antofagasta, in Chili, where she discharged her cargo of lumber, and received her instructions from her charterers to proceed to Caleta Buena in Chili, to take a cargo of nitrate of soda. She arrived at Caleta Buena on February 9, 1891. After her departure from Antofagasta, and while on her way to Caleta Buena, civil war broke out in Chili between the faction known as the Balmacedists, who supported the president, and those known as the Congressionalists, consisting of the congress of Chili and its adherents; each faction claiming to be the lawful government of the country. The Congressional party were in possession of Caleta Buena when the Dunstaffnaage arrived at that port, and the Balmacedists had no representative there. The president and his party were at that time recognized by the United States and other countries as the government of Chili, and they continued so to be recognized until September 7, 1891, when the Congressional party, having been victorious in the contest, was recognized. By the laws of Chili in force at the time the Dunstaffnaage lay at Caleta Buena, the sellers of cargoes of nitrate of soda were required to pay the government, at the point of shipment, an export duty on such cargoes. The charterers of the vessel had purchased in due time a cargo of nitrate of soda for shipment under the charter party, but were unable to obtain a delivery of the same from the sellers after the arrival of the vessel, for the reason, as stated in the stipulation of the parties to this suit, that "no sellers of nitrate would consent to deliver the same for shipment during such time as the Balmaceda party was unrepresented at Caleta Buena, on the ground that a payment to the Congressional party would not be a liquidation of such duty, and a defense to them as against any claim which might thereafter be made therefor by the Balmaceda party, or a defense against any charge that might thereafter be made against them by said Balmaceda party for the violation of said revenue law." The vessel

was subsequently loaded with the cargo of nitrate at the port where she lay, but a delay of 28 days occurred, for which the owners claimed demurrage under the terms of the charter party. On her arrival in due course at San Francisco, this suit to recover demurrage was instituted. A decree was entered for the libelant in the district court, and the charterers, the owners of the cargo, take this appeal therefrom.

There are two principal questions presented upon the appeal, the decision of both of which must depend upon the construction to be given to certain provisions of the charter party: (1) Was the delay in loading occasioned by the "default" of the charterers? (2) Was the delay excused by virtue of the last clause of the charter party, whereby exception is made in the case of nonperformance of the covenants by reason of "political occurrences," etc.? The provision for demurrage is one of the stipulations usually found in the contract. In the absence of a clause limiting the liability of the charterers to cases where the detention shall occur from the fault or default of the charterers, or from some accident or cause specifically named, the obligation to pay demurrage is an absolute one, and its meaning is that, if the ship is detained over the stipulated days, the charterer shall pay the stipulated sum for such time over and above the lay days as the ship is in such condition that she cannot be handed back for the owner. In Randall v. Lynch, 2 Camp. 352, where the detention was caused by the crowded state of the docks, but the charterer was, nevertheless, held liable, Lord Ellenborough, in delivering the opinion of the court, said: "I am of the opinion that the person who hires a vessel detains her if, at the end of the stipulated time, he does not restore her to the owner." In Barret v. Dutton, 4 Camp. 333, the detention occurred from a severe frost, which froze the river, and rendered loading impossible. The vessel, moreover, owing to the same reason, could not have sailed if she had been loaded in the stipulated time. The court, nevertheless, held the charterer liable for demurrage. But, in this case, there is inserted in the demurrage clause a limitation of the liability of the charterers for delay in loading or discharging. It is stipulated that they shall be answerable only for detention which may result from their default. To what extent does this provision modify their obligation? There is in the use of the word "default" no necessary imputation of negligence. As used in such an instrument, it can mean only the nonperformance of contract duty,—a failure upon the part of one of the contracting parties to do that which he had contracted to do. The most that can be claimed for its effect is that it excludes liability of the charterers for delay in loading or discharging, if the delay result from a sudden or unforeseen interruption or prevention of the act itself of loading or discharging. not occurring through the connivance or fault of the charterers. The courts have so construed such limitation in other contracts. In Thacher v. Gaslight Co., 2 Low. 361,[1] the parties had contracted for quick dispatch in discharging a cargo of coal, and,

[1] Fed. Cas. No. 13,850.

for every day's detention by default of the party of the second part, demurrage at $50 per day. The vessel arrived, and was delayed 10 days before she could get a berth at the charterers' wharf. There was evidence that the charterers had suitable accommodations for receiving cargoes of coal which were sufficient for ordinary occasions, and that they endeavored to charter vessels to arrive at such times as not to interfere with each other, and that they had done so at this time, but that, contrary to their expectation, other vessels arrived in port just before the libelant's schooner. The court said:

"The proviso intends to exonerate the charterers from delay occasioned by superior force acting directly upon the discharge of the cargo, and not from the indirect action of such force, which, by its operation upon other vessels, has caused a crowded state of the docks. If the respondents do not furnish the wharf room, or any other means or appliances which they are to supply, it is not enough for them to prove that they have taken reasonable measures to procure them. In short, the default does not mean negligence, but a failure of contract on their part, unless it is caused by a direct and unavoidable vis major, or something like it."

In Davis v. Wallace, 3 Cliff. 123,[2] it had been agreed that the vessel should have quick dispatch in discharging, and, in case of detention, the charterers were to pay demurrage, provided the detention should happen by their default. After reaching the wharf designated as the place of discharge, the vessel was detained three days by reason of the berth being occupied by another vessel. It was held that the libelant was entitled to demurrage. Clifford, J., in delivering the opinion of the court, said that the stipulation for quick dispatch excluded all delay save the time employed in discharging, except what was occasioned by natural causes beyond the control of the parties so contracting.

The appellants rely upon the language of Mr. Chief Justice Waite, in Davis v. Pendergast, 16 Blatchf. 565, Fed. Cas. No. 3,647, where, in referring to the limitation of liability to delays resulting from the default of the charterer, it was said:

"The respondent in effect agreed that no more than forty-five running days should be occupied in loading or discharging the cargo, unless it was occasioned by some unusual and extraordinary interruption, that could not have been anticipated when the contract was made."

There is in the decision no application of the words so used to the facts in that case, and there is no definition of the nature of the unusual and extraordinary interruption not anticipated by the contracting parties, which, in the mind of the court, would have excused the charterers. As a matter of fact, there was no such interruption claimed or proven in that case. The decision actually made was that the charterers were liable for delays which occurred through the intervention of "Sundays and holidays, customhouse and port regulations, and lack of wharfage and lighterage;" that those were risks assumed by the charterers, and that detention by reason thereof placed them in default. But the language of the opinion in that case is inapplicable to the facts disclosed in the

[2] Fed. Cas. No. 3,657.

case at bar. There was no unusual or extraordinary interruption in the loading of the Dunstaffnaage. There was no interruption or interference therewith at all. There was no interposition of force between the cargo and the vessel. There was no closing of docks or seizure of property. The difficulty was of an entirely different nature. It arose from the fact that the charterers had no cargo to load. In entering into the charter party, the shipowner placed his vessel at the disposal of the charterers for the stipulated time and voyage. He had the right to rely upon the existence of a cargo ready for shipment as soon as the vessel should arrive at Caleta Buena. The failure to provide that cargo was the default of the charterers. When the master of the vessel demanded the cargo, the charterers had none. Their cargo had been contracted for, but had not been delivered to them. They could not obtain possession of it. But there was no interference upon the part of the Chilian government, or upon the part of any armed force, to prevent their obtaining possession of the cargo, or handling or moving the same, or placing it within reach of the vessel's tackle. In the case of Dow v. Hare, Fed. Cas. No. 4,037a, an unreported decision of Judge Hoffman in the district court for the northern district of California, and affirmed on appeal to the circuit court, the charterer had chartered the ship to carry a cargo of coal to Oonalaska, and there deliver the same on board the United States steamer Saranac. When the chartered vessel arrived with her cargo at the designated port, the Saranac was not in port. She had been wrecked and lost at sea. The vessel, after waiting during her lay days and for several days thereafter, discharged her cargo on the wharf, and brought suit for demurrage. It was urged in defense of the action that the charterers were not liable, inasmuch as the detention was not due to their "default." In delivering the opinion, the court said:

"It was as much the part of the contract that the shipper should provide a consignee to receive the goods at the place of destination as that the carrier should transport and deliver them. If, on the arrival of the vessel, the consignee cannot be found after diligent inquiry by the master, the delay so occasioned ought in justice to be deemed to have been caused by default of the shipper or his agents. * * * By the bill of lading, the Saranac was the consignee to whom the coal was to be delivered. The consequence of her unpunctuality ought rather to be borne by the party whose agent she was, and who had particularly stipulated that she would be ready to receive the whole cargo within ten days after the ship arrived, rather than upon the shipowner, who was a stranger to the contract."

But it is contended in the second place that, while there may have been no interference with the act of loading, the delay is nevertheless excused by virtue of the last clause of the charter party, whereby the performance of all the charterers' covenants, including the covenant to "furnish and provide a cargo" is excused if prevented by "political occurrences," etc., and that, if the charterers are excused from furnishing a cargo, they are likewise excused for delay in loading, since the cargo must be furnished before it can be loaded. It is sufficient to say in answer to this argument that no political

occurrence is shown in this case which would serve to release the charterers from the performance of any of their covenants. The substance and effect of the covenant to provide and furnish a cargo was that the charterers would deliver a cargo within reach of the ship's tackle, for the purpose of loading. They did not covenant to purchase or acquire a cargo. With the procurement of the cargo, the shipowner had no concern. The charterers were to provide a cargo, and the owner was to provide a ship. In such a case the charterer may be presumed to have his cargo under control. If a political occurrence should prevent him from delivering a cargo or moving a cargo, the excuse contemplated in the charter party would exist; but when the intervention of the political occurrence is carried further back, and is made to apply to the procurement of a cargo in the market, the contingency is too remote to have been contemplated by the parties, unless the language of the charter party so expresses by clear and unmistakable terms. In this case the inability of the charterers to furnish a cargo arose from the refusal of all sellers of nitrate of soda to deliver cargoes of that article during the continuance of the then existing political situation. It is immaterial to this case whether such refusal was inspired by the fear of the sellers that they might subsequently be required to pay a second duty to the Balmacedan government, or by the fear that they might be dealt with as for acts treasonable to that government. Their reasons, whatever they were, were sufficient to cause an absolute refusal upon their part to deliver such cargoes. Political occurrences, it is true, had caused their refusal, but the political occurrences opposed no obstacle to their free disposition of their property, or to their handling or transporting the same by land or by water. Political occurrences had indirectly closed the nitrate of soda market at Caleta Buena, but the owners of that commodity were free to act concerning the same, and their refusal to sell and deliver was purely voluntary. The case is in no material feature different from the cases of The India, 1 C. C. A. 174, 49 Fed. 76, and Sorensen v. Keyser, 2 C. C. A. 650, 52 Fed. 163. In those cases, the contracts were for cargoes of saw logs, and the terms of the contracts required delivery alongside the vessels within a stipulated time, but excepted, in the computation of lay days at the port of loading, the time lost, if any, by reason of drought. The charterers were unable, on account of the low stage of water in the interior streams, occasioned by drought, to procure a cargo for delivery at the port. The court held that fact to be no defense to the actions for demurrage, that the inability to procure cargoes was not within the exception, and that the exception "by reason of drought" referred only to a failure to deliver alongside for loading. In Grant v. Coverdale, L. R. 9 App. Cas. 470, where the agreement was to load within a specified time, "frosts, etc., and other unavoidable accidents preventing the loading excepted," the charterer was held liable for demurrage, although frosts prevented him from bringing the cargo alongside the ship. The agreement in that case referred to delay in loading only, but the reasoning con-

tained in the decision is applicable to the case at bar. Lord Selbourne said:

"It would appear to me to be unreasonable to suppose, unless the words make it perfectly clear, that the shipowner has contracted that his ship may be detained for an unlimited time on account of impediments, whatever their nature may be, to those things with which he has nothing whatever to do, which precede altogether the operation of loading, which are no part whatever of it, but belong to that which is exclusively the charterer's business. * * * If, therefore, you are to carry back the loading to anything necessary to be done by the charterer in order to have the cargo ready to be loaded, no human being can tell where you are to stop."

The case of Hudson v. Ede, L. R. 2 Q. B. 566, cited by the appellant, was a case where, by the terms of the charter party, the vessel was to proceed to the port of Sulinah, and there load a complete cargo of grain, the cargo to be brought alongside the ship at the port of loading, at the charterer's expense and risk, 30 days to be allowed for loading and unloading, a demurrage over and above laying days, at six pounds a day, "detention by ice and quarantine not to be reckoned as lay days." It appeared that all grain shipped at Sulinah was kept at points higher up the Danube, and was brought by lighters down the river, and unloaded into ships at Sulinah. The ship being ready to load, notice was given the charterer, but the river immediately above Sulinah became frozen up, and so remained for two months. The charterer was unable to bring his cargo down the river, and he was held not liable for demurrage. But that was not a case of failure to provide a cargo. It was the decision of the court that since, from the circumstances and the custom of the port, the cargo had to be brought down the river after the arrival of the ship, detention by ice must be construed to extend to detention by ice of the lighters coming down the river to load the ship, and that the lighters were as much prevented going to the ship and loading the same by reason of ice in the river as they would have been by ice obstructing their movement in the port of Sulinah itself.

It follows from these views that the decree must be affirmed, with costs to the appellee.

ROSS, District Judge (dissenting). I am unable to agree to the judgment in this case. The gist of the contract between the parties was that Grace & Co. were to provide and furnish the ship, within reach of her tackle, at the port of Caleta Buena, a full cargo of nitrate of soda in bags, which the ship should there receive, and transport direct to San Francisco, and there deliver, for a certain stipulated sum per ton of 2,240 pounds; the charterers to be allowed for the loading of the ship 30 working lay days, to commence 24 hours after her inward cargo and unnecessary ballast should be finally discharged, and the receipt by them of written notice to that effect from her captain. The charter party further provided that for each and every day's detention by default of the charters or their agents they should pay to the ship demurrage at the rate of four pence sterling per ton per day, but should the ship be detained by the master beyond the time specified, demurrage should be paid

to the charterers at the same rate and in the same manner; and it concluded with this provision:

"The act of God, enemies, political occurrences, fire, and accidents beyond charterers' control, as well as the dangers of the seas and navigation, always excepted."

This exceptive clause manifestly applies to each and every covenant of the charter party,—to those on the part of the charterers to procure, furnish, and load the cargo, as well as to that on the part of the ship to transport it. If an act of God or of enemies, or political occurrences, or fire, or an accident beyond the charterers' control, or of navigation, cause the failure of either party to comply with either or all of the terms of the contract, such failure must be held excused, for the reason that such is the agreement the parties made. The question then is, did such political occurrences intervene between the making of the charter party and the time the ship was ready to enter upon its performance as to exonerate the charterers from liability for the detention to which the ship was subjected? It is conceded that, after the making of the charter party, the charterers purchased, from a certain company at Caleta Buena, the contemplated cargo of nitrate in time for shipment in accordance with the terms of the contract. But, before the time for shipment arrived, what was practically a civil war broke out in Chili between two factions, one of which was called the Balmaceda party and the other the Congressional party, and each of which claimed to represent the legitimate government of the country. That war was in progress when the ship got ready to receive the cargo. The port of Caleta Buena was then in the possession of the Congressional party, and there was no representative of the Balmaceda party there. By a law of Chili then in force, there was payable by the sellers on all cargoes of nitrate sold for shipment from Chilian ports an export duty of $1.50, Chilian money, per 100 Spanish pounds, which duty was payable to the government of Chili at its customhouse at the port of shipment. It is further stipulated by the parties that the only reason why the cargo was not shipped within the time required by the charter party was "that no sellers of nitrate would consent to deliver the same for shipment during such time as the Balmaceda party was unrepresented at Caleta Buena, on the ground that a payment of the export duty to the Congressional party would not be a liquidation of such duty and a defense to them as against any claim which might thereafter be made therefor by the Balmaceda party, or a defense against any charge that might thereafter be made against them by said Balmaceda party for the violation of said revenue law."

It is not important, I think, whether or not the fears of the nitrate sellers were well founded, although it is not unreasonable to suppose, in view of the history of that contest, that payment by a seller of nitrate of the duty imposed by the Chilian law upon its exportation, to the Congressionalists, thereby furnishing them in part with the sinews of the war they were waging against the party headed by the then president of the republic (Balmaceda), might, in the

event the latter had been successful in the contest, have been visited with consequences far more serious than the collection of the duties over again. The agreed fact remains that none would consent to deliver any nitrate for shipment during the time here in question, and that such refusal was caused by the then prevailing political occurrences. For this reason the charterers were unable to procure or furnish the cargo for the ship during the time in question, and, as a necessary consequence, unable to load it within that period. The real cause of this failure on their part was the political occurrences—the political contest then being waged between the contending factions in Chili—against liability for which by either the parties to the charter party chose to stipulate. I think the cases of The Village Belle, 2 Asp. 230, Hudson v. Ede, L. R. 2 Q. B. 566, and Fenwick v. Schmalz, L. R. 3 C. P. 313, give support to this view, and that the cases of Grant v. Coverdale, L. R. 9 App. Cas. 470, The India, 1 C. C. A. 174, 49 Fed. 76, and Sorensen v. Keyser, 2 C. C. A. 650, 52 Fed. 164, are not against it. In Grant v. Coverdale, the clause of exception applied only to the failure to load. In The India and in Sorensen v. Keyser, the exception "by reason of drought" the court held referred only to a failure to deliver the logs alongside the vessel for loading. But in the case at bar the parties themselves so placed the exception clause in the charter party as to make it apply to every covenant thereof.