## THE NIVOSE.

## PLISSON STEAM NAV. CO., Limited, v. WILLIAM H. MULLER & CO., Inc.

(District Court, D. Maryland. July 25, 1923.)

1. **Shipping ⊝175—"Default" of charterer means failure to load within time specified.**

In a charter party fixing lay days for loading and providing for demurrage for detention through "default of the charterers," the term "default" means merely failure to comply with the agreement to complete loading in the specified time, and does not embrace all the excuses usually found in standard forms of charter party in general use.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Default.]

2. **Shipping ⊝178—Charterers held liable for demurrage for detention in loading.**

Where detention of a ship loading with grain at Baltimore was caused by failure of charterers to obtain shipment from Buffalo of the grain intended to be loaded, they are not relieved from liability for demurrage because such failure was due in part to a strike affecting the railroad with which they had contracted for the carriage, and in part by a preference order issued by the Interstate Commerce Commission, which kept the railroad company from using cars otherwise available, neither of which facts directly affected the loading, and where it did not appear that charterers could not have procured the grain elsewhere.

In Admiralty. Suit by the Plisson Steam Navigation Company, Limited, owner of the steamship Nivose, against William H. Muller & Co., Inc. Decree for libelant.

Janney, Stuart & Ober, of Baltimore, Md., and Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City, for libelant.

Brown, Marshall, Brune & Thomas, of Baltimore, Md., for respondent.

SOPER, District Judge. A libel in admiralty in personam was filed in this court by the owner of the steamship Nivose against her charterer to recover 26 days 2½ hours demurrage for her detention at Baltimore in loading a cargo of grain shipped at that port, to be carried to one or two ports on the continent between Antwerp and Hamburg, under a charter party which contained these, among other, provisions:

"Steamer to be loaded according to berth terms, with customary berth dispatch, and if detained longer than five days, Sundays and holidays excepted, charterers to pay demurrage at the rate of six pence .(6d.) British sterling, or its equivalent, per net register ton per day, or pro rata, payable day by day, provided such detention shall occur by default of charterers or their agents.

"Notification of the vessel's readiness must be delivered at the office of the charterers or their agent, at or before 4 p. m. (or at or before 12 m. noon, if on Saturday), vessel also having been entered at the custom house, accompanied by pass of the inspector of vessel's readiness in all compartments, and the lay days will then commence at 7 a. m. on the next business day."

The steamer arrived at the port of New York with cargo, and on October 5th was ordered by the charterer to proceed to Baltimore,

and did so proceed. She was at Baltimore, ready to load in all respects, and written notice thereof was given by the master to the charterer, at 2 p. m. on October 11th. The charterer did not supply any cargo to the steamer until 8:50 a. 'm. on November 11th, and the loading of the cargo was commenced on that day, and was completed at 9:30 p. m. on November 14th. The libelant therefore claims demurrage from the charterer from October 19th, at 7 p. m., until November 14th, at 9:30 p. m., at the charter rate of 6 pence per net registered tonnage of 2,752, or £68 16s. daily, or its equivalent in United States currency, amounting to $8,027.98.

The charterer admits the delay complained of, but claims that it was not occasioned in whole or in part by the default of the charterer or its agents, but was directly and immediately caused by an extraordinary shortage of railroad cars required for transportation of grain to the port of Baltimore, over which the charterer had no control, and which it could not have anticipated. This car shortage was due to the general disruption of railroad service, caused by certain priority orders of the Interstate Commerce Commission, and embargoes, whereunder the railroads were required to give priority to shipments of coal and manufactured foodstuffs, at the expense of all other commodities, and occasioned also by the settlement of the coal strike in August and September, 1922, and the ensuing tremendous movement of coal. To sustain the allegations on its behalf, the charterer offered to prove the following:

"The charterer had sufficient grain in its possession to provide the cargo for the vessel, prior to the arrival of the vessel at Baltimore, and prior to the ordering of the vessel to Baltimore. This grain was in storage in elevators at Buffalo, or in-lake vessels in the port of Buffalo, waiting and ready to discharge at the elevators in an amount of approximately 4,000,000 bushels. It was purchased at various points in the West and Northwest, being shipped from various points of origin for export, via Buffalo. An express contract had been made by the charterer with the Pennsylvania Railroad Company, for the purpose of providing transportation of the grain from Buffalo to Baltimore in time to meet the engagements of the charterer with the vessel, and timely advice had been given to the Pennsylvania Railroad of the names of the lake steamers containing grain intended to be moved. Shortly after the agreement with the railroad company was made, the charterer was advised that the Pennsylvania Railroad was making no preparation to move the grain, as undertaken, and was declining to do so. The matter was brought to the attention of the railroad company by formal letters, demanding that the requirements of the agreement be observed, but despite continuous efforts by the charterer the railroad company failed to move the grain. Efforts were also made by the charterer to secure shipment of the grain over the Western Maryland and the Baltimore & Ohio Railroads, without success. During the months of September and October, 1922, there was no movement of grain on the Western Maryland Railroad from Buffalo to Baltimore, and no movement of grain, owing to an embargo, on the Baltimore & Ohio Railroad, and the Pennsylvania Railroad was the only road attempting to move such grain. This movement was sporadic, and constituted a very small proportion of the requirements. The inability of the Pennsylvania Railroad arose from its lack of equipment, and from the operation and effect of Service Order No. 25, issued by the Interstate Commerce Commission under date of September 19, 1922, giving preference and priority to the transportation of coal to the lakes and for water movement beyond, and requiring the Eastern railroads to give preference and priority to the return of empty cars on their rails belonging to

Western carriers, which causes made it physically impossible for the railroad to forward grain from Buffalo to Baltimore, in accordance with its contract with the charterer. The normal capacity of the Pennsylvania Railroad, in ordinary times, amounted to several hundred cars per day, from Buffalo to Baltimore, but during September, October, and November the actual movement averaged 25 or 30 cars a day. An additional handicap of the railroad was the congestion of its lines and terminals, as the result of the shopmen's strike and the flood of traffic which was released from other lines after the termination of the strike. Grain was not included within the priority order issued by the Interstate Commerce Commission."

The charterer also offered in evidence a number of forms of charter parties, containing certain clauses excusing the charterer from complying with the provisions of the charter party with reference to loading, such as acts of God, restraints of rulers and princes, strikes, etc. On the objection of the libelant, all the evidence so offered was excluded.

[1] The case turns on the proper interpretation of the term "default of charterer," contained in the charter party. The charterer contends that the term "default" was intended by the parties to embrace all the excuses usually and ordinarily found in the so-called standard forms of charter parties offered in evidence and in general use in Baltimore and elsewhere in this country. Amongst these excuses are the restraints of rulers and strikes. It is argued that S. O. No. 25 of the Interstate Commerce Commission constituted a restraint of rulers, and that, since this order and the strike interfered with the shipment of grain from Buffalo to Baltimore, the charterer is excused from paying the demurrage claimed in this case. No authority has been cited to support the contention that the term "default" should be given this broad and unusual interpretation. On the other hand, there is ample authority for the proposition that default in such a document means merely the failure to comply with the agreement to complete loading in a specified time. Crossman v. Burrill, 179 U. S. 100, 21 Sup. Ct. 38, 45 L. Ed. 106; Southern Transportation Co. v. Unkel (D. C.) 236 Fed. 779; Hughes v. Haskins Co. (D. C.) 136 Fed. 435; Nitrate of Soda v. McLeod, 61 Fed. 849, 10 C. C. A. 115; Fido v. Lloyd (D. C.) 267 Fed. 733; The Nordhvalen, [1923] A. M. C. 398; M. O. H. of West Indies v. Hannevig, Inc. (C. C. A.) 264 Fed. 311.

[2] The liability of the charterer to pay demurrage for detention of the vessel, contrary to the terms of the charter party, is not absolute under all circumstances. The defense of vis major, or its equivalent, is a complete answer. The equivalent may be a superior force acting directly upon the loading or discharging of a cargo, or an unusual or extraordinary interruption or prevention of the act of loading or discharging, not occurring through the connivance or fault of the charterer, and which could not have been anticipated when the contract was made. See the cases above cited.

It can hardly be claimed that the strike referred to in the offered proof was so unusual, extraordinary, and unexpected a circumstance as to be equivalent to vis major. It is argued, however, that S. O. 25 was a superior force, over which the charterer had no control, and which could not have been foreseen. But the fact is that S. O. 25 did not act directly to prevent the loading of the ship. It may be that, if

the Interstate Commerce Commission had forbidden the export of grain, the charterer would have been excused. Such was not the case. Indeed, the order did not even forbid the shipment of grain from Buffalo to Baltimore, and a considerable amount was so shipped by the Pennsylvania Railroad for the charterer during a period beginning September 17, 1922, according to the offered proof. No doubt the amount shipped was diminished by the causes mentioned, and was insufficient to enable the charterer to fill all of its requirements; but there is nothing to show that the charterer did not have at least enough grain to load the chartered ship.

Furthermore there is nothing in the offered proof to show that the charterer could not have obtained grain elsewhere. Indeed, the stipulation of counsel filed in the related case of Natale Suttora, Master of the Italian Steamship Clara Camus against the same charterer (no opinion filed), which is also evidence in this case, shows that on every day between October 9 and November 9, 1922, there was a large quantity of grain in elevators in Baltimore, and that between September 28 and November 1, 1922, 48 ships, destined for foreign ports, were loaded with grain in Baltimore.

Even if the charter party had contained the excuses set out in the standard forms offered in evidence, or should be so interpreted as to include them, the defense is insufficient. The events recited merely interfered with or prevented the charterer from getting its cargo from Buffalo. It was held by Judge Rose, in the case of the Hellenic Transport Steamship Co. v. Archibald McNeil & Sons Co., 273 Fed. 290, as follows:

"Still more clearly it is settled that it [the cause of delay] will not relieve from liability because its happening prevented the party relying upon it from getting his cargo for the ship from the source at which he had planned to obtain it, unless that was, by the terms of the charter, or in the contemplation of the parties at the time it was made, or by the well-established course of trade the only source from which he could have been expected to get it."

This decision was cited with approval by the Circuit Court of Appeals for the Fourth Circuit in the case of Johnston v. Compagne Navigazione Sota y Aznar, 288 Fed. 847.

As the defense set out by the charterer cannot be sustained, it must be held liable for its failure to load the ship, and must pay demurrage at the rate specified by the charter party with interest.