## THE SVARTFOND.

### DAMPSKIB STORFONDS AKTIESEKSKAP v. WHITNEY & KEMMERER.

District Court, E. D. Pennsylvania.
Feb. 28, 1930.

H. Alan Dawson, of Philadelphia, Pa., for plaintiff.

Otto Wolff, Jr., and Lewis, Adler & Laws, all of Philadelphia, Pa., for defendant.

DICKINSON, District Judge.

This cause grows out of a charter party contract for the hire of a ship. The very capable proctor for the respondents did not during the trial change his course, but kept headed for the harbor of defense for which he was bound, but, like the skillful sailing

master he is, has sought to take advantage of every slant of wind to work to windward all he could, and has from time to time shifted his helm for this purpose. The first thought was that of reforming the written contract so as to more fully and definitely express and reflect the meaning of the real contract evidenced by the bargaining of the parties; the next was to have appear a contemporaneous oral contract on the faith of which the charter party was signed by the respondents; the third was to show that the written contract was expressed in the terminology of the shipping trade, and what meaning in the usages and practices of the trade was given to the terms employed in the contract; and the final emphasis was laid upon the construction properly to be given to the contract as written. So far as we have been able to discover, there is not a single evidentiary fact which is in real controversy. The record, however, is quite a voluminous one. When the first suggested defense opened it, of course, encountered the usual objection. For the purpose of saving time, the respondents were permitted to put of record all the facts they wished to prove subject to such objections as might be interposed. This was by analogy to Equity Rule 46 (28 USCA § 723). The advantage in mind was that any review of the cause would be by way of appeal, and if all the evidence was of record the appellate court could dispose of the whole case, whereas if any evidence was rejected a new trial might be necessary. When the case and defense finally rested on the proper construction of the written contract, the examination and cross-examination unavoidably became argumentative, and hence well-nigh interminable. We have in consequence a lengthy record, when all the pertinent facts could be gathered in a few minutes from the pleadings and the admissions of the parties at the trial.

 It is without doubt the truth that a contract can be best construed by a reader who understands its subject-matter. Even courts need to know something. Much of the information they must have they are permitted to get (as the phrase goes) by taking judicial notice. This needed information they get in any way they can, and as they must get it from some source, there is no objection, so far as we can see, to their informants being under oath. Whether the fact statements in this record are in the strict sense evidentiary or not, they may nevertheless be helpful. Charter parties are of practical importance. Ships and shippers should know what they mean when entered into, and it is highly important that they should be understood as the courts finally construe them. Executive or administrative construction of laws, while in no sense mandatory of judicial construction, are none the less informative and may be persuasive. In the same sense it is never harmful to any court to know what meaning those who have to do with charter parties attach to them. Again, trade terms as words of art are used in their trade meaning sense, whatever their meaning may be, when used in common speech, and their so-called technical meaning thus becomes important. For example, there is in use in the shipping trade a charter party phrase known as the "in berth" clause. If there were an accepted custom, usage, or practice, of the trade to treat these words, as applied to lay days, to mean that the count of lay days did not begin until the vessel was physically in her berth, and the ship stood the loss of time in finding a berth, such would be the meaning which the courts would give to the phrase. This does not mean that the courts yield to others the duty of construing contracts; it merely means that the courts give to words the sense given to them by the contracting parties. All words, whether of art or of common speech, have an ordinarily accepted meaning, but this meaning must yield to the right of the parties to contract as they please. Any one who has ever made or witnessed the attempt to prove a contractual term or phrase to have a trade custom meaning has usually observed its futility. The reasons (both of which appear here) are that with rare exceptions there is no stereotyped trade phrase used in contracts which has in its entirety a trade meaning, but the contracting parties have used language of their own which has embraced or embodied some word or words which usually appear in such contracts, or the witnesses to the trade practices confuse a real trade custom, usage, or practice meaning attached to certain words with the meaning which they as expert interpreters would give to the contract as written. The real question thus becomes, not what the trade meaning is, for there is none, but what the contract as made means. To this a judicial, not a witness, answer must be given. Every contract, however, we say again is best interpreted in the light of an understanding of its subject-matter and of the parties to it and of the fact situation out of which it grew. These make the framing of the picture which is to be studied and interpreted.

■ These features in the present case are not hard to visualize. No sworn testimony is needed to convince any one that the owners of a ship want to be paid for her services from the time she is chartered until she is discharged and free to seek another cargo. No stronger evidence is needed to persuade us that the shipper does not want to pay except for the time the ship is actually rendering service. There is, however, necessarily an interval of time between the making of a charter party and the start of the cargo bearing voyage. Upon whom this loss of time falls is a matter of express or, in its absence, of implied contract. If nothing is said, the obligation of the ship is to tender her services within a reasonable time after she is hired, and of the shipper to accept her services within a reasonable time after they are tendered, and the pay begins from the time of this acceptance.

■ The negotiations which led up to this contract were conducted through a ship's broker as intermediary. He was a real broker who represented neither party and whose work was done when he had brought the parties together in a contract. Chronologically, the shippers first sought a ship by calling on the ship's broker to find one for them. They were coal dealers who had a contract with Copenhagen consignees for coal. The coal came from a West Virginia mine and could not reach Philadelphia until at least five or six days after it was loaded on cars, and might take longer. The only available piers at which it could be put aboard a vessel belonged to the railroad companies. These piers were shipping piers, the coal being loaded on the vessel directly from the cars. The railroads would not haul the cars to the piers unless the shipper had provided a ship on which to load the coal. This put the shippers between the devil and the deep sea of the railroad and the vessel carriers and required them to plan the time of loading with some nicety.

This metaphor was not chosen to reflect upon the railroads, but if the ship was not ready to take the coal when it arrived, there would be railroad demurrage, and if the coal was not at hand when the ship reported, there would be ship demurrage.

These conditions were inflamed by the fact that the coal strike in England had made an unusually heavy demand for American coal, with a consequent congestion of railroad coal carriage, and a railroad embargo was in force.

This situation was fully explained and made known to the broker, accompanied with the statement that they wanted a ship with lay days for loading not to begin until the ship was in the loading berth and the loading had begun. The broker was employed to find such a ship. He applied to the agent for the ship of the libelants. The ship was in the general cargo carrying trade but willing to take on a coal cargo. They offered the ship to the broker under the ordinary form of charter party which made the lay days begin when the ship reported less only a deduction of forty-eight or other named number of hours for delay while awaiting her turn in loading berth. The broker replied that such a charter party would not be acceptable, as the shippers would insist upon what he termed the "in berth" clause and explained why. Incidentally the latter form of charter party was usually in coal cargo contracts. These negotiations took place before July 5, 1921. The ship was then ready to take a cargo, or would be shortly thereafter. Information was asked for and given as to when the coal would be ordered and how long it would take to reach the piers. This was that the coal could be ordered at once and would take five or six days to reach the piers, but under the conditions then prevailing might take longer. The agent stated that he must cable the owners. This he did and told the broker what the ship was willing to do. The charter party contract, as we now have it, was prepared by the broker, and the ship expressed its satisfaction with it. He then reported to the shippers telling them the "in berth" clause as he had written it would give them the protection for which they had asked. The contract was thereupon signed. It bears date July 6, 1921, but may not have been signed by both parties before the 8th. In order that it may be read understandingly, it may be premised that a printed form was used containing the following clause: "Lay days for loading if required by the party of the second part" (the shippers) "not to commence before July 14th, 1921; otherwise lay days to commence from time steamer is ready to load [or within 48 hours after readiness to load if delayed awaiting turn at berth] and Master has given notice in writing of such readiness," etc.

The broker changed this by striking out the phrase within brackets "or within 48 hours after readiness to load if delayed awaiting turn at berth," and substituting for it

by interlineation the phrase: "in loading berth and ready to load."

As the language thus became somewhat involved and confused, we restate the clause as finally written: "Lay days for loading if required by the party of the second part not to commence before July 14, 1921 otherwise lay days to commence from time steamer is ready to load in loading berth and ready to load and Master has given notice in writing of such readiness," etc.

Let us pause here to make what may be a clarifying comment. The ship presumedly could have reported July 6, 1921. She agreed to make no charge for demurrage accruing before July 14th. This gave the shippers eight days in which to get the coal to the pier. This we suppose prompted the broker to assure them that the contract as he had written it protected them against the payment of any demurrage before the ship was in her berth, as she could in no event charge demurrage before the 14th and the coal would be on the pier by that time. It turned out that the broker was mistaken in his prophecy and the shippers in their expectation, but the broker was expressing only his own opinion, having no authority to speak for the ship, and the shippers followed their own judgment (although doubtless influenced by that of the broker) in signing the contract. This makes the contract turn upon the meaning of the writing and this meaning determines the law of the case. As is the contract ita lex est. The shippers promptly ordered the coal, and it arrived as soon as under the existing conditions the shippers could get it to the pier. The ship in fact arrived in the port on July 8th and made known her presence, but as she had nothing to gain by this early arrival, she gave the formal written notice of readiness on July 14, 1921, and demanded demurrage from that date.

We make the fact finding that had the berth been ready for her she would have reached it by 2 o'clock of the same day. The shippers were not able to have the berth ready before, so that the ship was not physically "in berth" until July 21st. The controversy is thus really over demurrage from the 14th to the 21st. When did the count of lay days begin under this contract? Owing to the fact that the scrivener who wrote the contract was attempting to do so by changing a printed form, the contract is not as clearly expressed as it doubtless would otherwise have been. It literally fixes two different dates. One, when the ship arrived in port ready and reported her readiness; the other, when she was in loading berth ready. If we have in mind that the latter provision was a substitute for the waiting her turn at berth clause of the printed form of contract, the meaning in this respect becomes clear.

This takes us to the contract as written and the inquiry into its meaning. The latter, as we read the contract, is "if the ship, unless the shipper requires it, reports before July 14th, lay days shall not begin before that date otherwise (that is except for this provision) lay days begin when the ship reports, etc., but there is to be no charge for the time required by the ship to get into her loading berth, the shippers agreeing that a berth shall be ready by July 14th for the ship to go into."

There is another provision of the contract which may have some bearing on its meaning. It is that if the ship did not arrive by July 20, 1921, the shippers might declare the contract off. The ship wanted the lay days to begin July 6th. As it turned out, the shippers did not want them to begin until July 21st. The parties compromised on July 14th.

This means, under our finding, that the count of lay days begins at 2 o'clock on July 14, 1921.

In the well-considered brief submitted by the respondent, the further position is taken that the contract here is not one expressed in the charter party but implied by law from the fact situation. The value of this point of view to the respondent may be appreciated if we assume the silence of the contracting parties and have in mind the fact situation that the coal was to be loaded directly from the cars to the ship, and that the railroad would not admit the ship to the loading berth until the cars were at hand. The ship clearly then would have met her obligation by reporting her readiness to load, but it might very well be that the shipper met his by accepting the ship when in loading berth and was not bound to accept sooner, assuming, of course, that the delay between arrival at port and in loading berth was not due to the shipper. In other words, that "reasonable time" for acceptance was elastic enough to cover all the delays not ascribable to the shipper. We are not able to adopt this point of view, however, because the parties did contract, and the question becomes the meaning of their contract, not what contract the law would ascribe to them had they not contracted for themselves. It is of the very genius of the English language that

its words import no fixed meaning. Such meaning must be gathered. In this sense the meaning attached to the words of a contract is always (except when words of art are employed) an implied meaning. This is not the sense, however, in which the law makes use of the words "implied contract." They are merely employed to supply missing links in a chain of artificial logic. The law determines the legal rights of the parties on the basis of a contract. If they have made one in fact, the law interprets it and determines the point where the minds of the parties met; if they made none, resort is had to the legal fiction that one was nevertheless made and what it was. When the agreement is expressed in words the effort is to get at what the parties had agreed. Anything may shed light upon this, and the fact situation to which the subject-matter relates is of the utmost importance. None the less the meaning sought is the meaning to be gathered from the contract the parties have themselves made, not the meaning of a contract which the law would make for them. The point we are striving to make is that a contract not fully or obscurely expressed, and hence difficult to interpret, is not because of this an implied contract in the legal sense. If the thoughts passing through the minds of the parties as expressed in the printed form before it was changed were followed to whether the two minds met, we think this would have been the path. The ship's thought was that lay days should begin when the ship was ready to load; this was met by the thought of the shipper that there might be delay in the ship reaching her loading berth and in awaiting her turn. The minds met in the ship shouldering 48 hours of this delay. The thought of the ship in reaching the contract which was made was that lay days should begin when the ship was ready to load; the thought of the shipper was that the cars might not be on hand when the ship reported or that the ship might not be there when the cars were, and there would be some delay after reporting in moving the ship to her loading berth. This first thought was met by the agreement that the lay days were not to begin before July

14th, which was expected to give time for the cars to arrive; the second thought was met by the agreement that if the ship had not reported by July 20th the shipper need not accept her service; and the third by the extension of the beginning of lay days time from the reporting of the ship to the time she was in her loading berth. The meaning of this contract is perfectly clear except in the feature of the possibility (which afterwards developed into a fact) that the cars might be delayed in arrival beyond the expected date. In this event who stood the delay? The construction we have put upon the contract is in effect that it was agreed that the ship should stand for it up to July 14th, and that the shipper should stand for further delay, if there was any.

As the case here is one of the construction of a contract, decided cases are no guides except in like contracts and as analogues. We find nothing in the cited cases to which the reading we have given to this contract is hostile. Donnell v. Amoskeag Co. (C. C. A.) 118 F. 10; Randall v. Sprague (C. C. A.) 74 F. 247; Niver Coal Co. v. Cheronea (C. C. A.) 142 F. 402, 5 L. R. A. (N. S.) 126; Empire Transp. Co. v. Phila. (C. C. A.) 77 F. 919, 35 L. R. A. 623.

We do find support in the following cited cases for the conclusion we have reached: Sixteen Hundred Tons of Nitrate of Soda v. McLeod (C. C. A.) 61 F. 849; New York & Cuba Mail S. S. Co. v. Guayaquil (C. C. A.) 270 F. 200; Carbon Slate Co. v. Ennis (C. C. A.) 114 F. 260.

As we view this case, it is one of the failure of the shipper to provide a cargo. It was the obligation of the shipper to have a cargo ready, but the ship agreed to assume all of the delay up to July 14th. It follows, we think, that thereafter the cost of delay was upon the shipper.

We have no doubt counsel will be able to agree upon the judgment which should be entered in accordance with this opinion, and leave is granted to enter it. If they do not so agree, the court will enter the judgment, retaining jurisdiction of the cause for this purpose.