Pardee, Circuit Judge.
On the 11th day of October, 1889, the Norwegian bark Urania, then lying in the port of Liverpool, was chartered by W. S. Keyser to take a cargo of pitch pine timber from Ship island, or Pensacola, as ordered, to some port in the United Kingdom of Great Britain, or the Continent. The charter contained the usual general stipulations, and, in addition, the following special clauses, which are the subject of dispute in this cause:
“Twenty-seven (27) working days are to be allowed the said merchant in which to deliver the cargo at the port of loading, which is understood to mean actual delivery of cargo alongside, and not to complete loading. In the computation of the lay days allowed for delivering the cargo shall be excluded any time lost by reason of drought, floods, storms, or any extraordinary occurrence beyond the control of the charterer. Demurrage to be paid for each working day, beyond the days allowed for loading, at £20 per day; and the charterer may keep the ship on demurrage 10 days.”
The ship arrived December 30, 1889, and was. ordered to take cargo at Ship island, and was ready to load January 7, 1890, of which fact Keyser received due notice. Libelants claim that the 27 lay days expired February 12, 1890, at which date no cargo had been furnished. Delivery did not begin until the 17th of the month, and was not completed until April 1,1890. For these 47 days of wrongful detention the master demanded demurrage, which the charterer refused to pay, claiming that, owing to,the prevalence of a drought which delayed him in procuring cargo, the lay days had not expired when the loading was completed. As the master refused to issue a bill of lading without noting thereon his claim for demurrage, and Keyser threatened to libel the vessel for damages on account of such refusal, it was mutually agreed, as a compromise, that the master should issue a clear bill, but without prejudice to his right to file a libel in personam against Keyser for the amount claimed. This suit was accordingly brought by the'owners of the Urania, in which they claim the sum of $4,574.04.
It is admitted by defendant in his answer that the ship was ready to receive cargo January 7, 1890, but that none was furnished until February 11th, and that the delivery was not finished until March 30th. As excuse for this delay he alleges—
“That, at the time said vessel reported for cargo under the terms of said charter, there was an unusual drought, general and extensive, prevailing throughout the whole country from which timber is obtained for the loading of Ships at Ship island, Moss point, and other points in that vicinity, which drought continued for a long while, and prevented this respondent from obtaining cargo for the loading of said vessel, notwithstanding he had made arrangements for procuring cargo for her, and would have procured same in ample time to have loaded her within the period of twenty-seven working days, but for said drought. And hefurther alleges that on the 10th, 11th, 13th, and 14th of January, the 8th, 24th, 25th, and 27th of February, and on the 4th, 5th, 6th, 8th, 10th, 11th, 12th, 13th, 18th, 19th, 22d, and 31st days of March, 1890, (being in all twenty days,) storms prevailed which rendered it impos *165 sible for timber to be delivered to said vessel, excepting at great risk and hazard. And that, excluding the time lost by reason of said drought and storms, lie delivered the cargo to said vessel within the period required by the terms of said charter.”
. The judge of the district court being of the opinion that the existence of the drought had heen established, and that it excused defendant’s delay in delivering cargo, dismissed the libel. While defendant claims in his answer that drought prevented him from obtaining timber for cargo, he does not allege, nor does it appear in proof, that on any of the days specified storms in any manner interfered with the delivery of timber to the vessel, nor that any time was actually lost from that cause. The only proof as to storms is found in the deposition of William Rudolph, who names January 10th, 11th, 13th, and 14th, February 8th, and March 4th, 5th, 6th, 8th, 10th, 11th, 12th, 13th, 17th, 19th, 21st, 22d, 24th, 26th, and 27th, in all 20 days, as too stormy to permit timber being towed. His observations were made at Moss point, some 6 miles inland, and on cross-examination he admits he did not know the velocity of the wind nor its direction on any of the days enumerated, nor the character of the weather, except that it was stormy. Notwithstanding this alleged state of the elements during this period, he testifies that timber was actually sent to the Urania and other vessels at Ship island on the following of the above days: January 14th, March 4th, 8th, 11th, 12th, 13th, 19th, 21st, 22d, 24th, and 26th, in all 11 days out of the 20 claimed to have been stormy. It does not appear that defendant was ready to deliver cargo on any of the other 9 days. ■
The charter gave the defendant 27 working days only, within which to deliver his cargo. The term “working day” means, in maritime affairs, running or calendar days on which the law permits work to be done. It excludes Sundays and legal holidays, but not stormy days. Pedersen v. Eugster, 14 Fed. Rep. 422; The Cyprus, 20 Fed. Rep. 144; The Oluf, 19 Fed. Rep. 459.
It is to be observed also in this connection that, under the terms of the charter, only time lost by drought and storms during the lay days is required to be excluded in the computation. That time lost after the expiration of the lay days was to he paid for, without regard to the happening, of any unforeseen event, is evidenced from the express stipulation written in the charter immediately after the drought and storm clause, which provides that demurrage shall be paid for each working day beyond the days allowed for loading. Time lost from these causes before the beginning of the lay days, or after their expiration, is not to be deducted’in computing the demurrage, even if the term “working days” does not exclude all such time. During the lay days proper, January 10th, 11th, 13th, and 14th, and February 8th were stormy, according to the evidence above referred to, which, while not as satisfactory as could be wished, is not contradicted. The evidence does show that on January 14th some timber was delivered by Keyser to another ship, but that may have been at a great risk,—a risk the appellee was' not compelled to take in the case of the Urania. On the whole, we are inclined *166 to the opinion that, in computing the lay days under the charter in this case, January 10th, 11th, 13th, and 14th, and February 8th should be excluded.
The case show's that defendant lost the time which caused the delay in delivering cargo by a drought which occurred prior to the beginning of the lay days, and even antedated that charter, and which affected his ability to obtain the required amount of timber to load all the ships he had chartered, either in the market at Moss point, or in the interior country. He does not claim in his answer that the drought prevented the delivery of the timber from Moss point, or any other port, to the vessel at Ship island; but says that it .prevented him from obtaining timber within the stipulated lay days. He was engaged in the business of buying and exporting timber, having an office at Pensacola and Moss point. Having no stock of timber of his own stored anywhere, arrangements were made during the summer and fall of 1889 to procure timber from mill and log men, to meet the requirements of his trade. Contracts w'ere made as early as September for a large amount of timber, with parties whose business it was to get out logs in the interior country along the upper tributaries of the Pascagoula river.’ These contracts were in form executory agreements in which the contractors agreed to cut and deliver into the booms of defendant at Moss point certain round and hewn pitch pine logs as soon as water will permit, not later than July 1, 1890; the timber to be paid for when inspected and measured. But such contracts vested no present title in Keyser to any particular timber, and the contractors were under no obligation to deliver in sufficient time to load the libelants’ vessel. Defendant himself knew at the very time he chartered the Urania that his supply of timber from these sources was necessarily uncertain, as he was then aware that a drought had prevailed throughout that w'hole country since the July previous. After the contract for timber had been made, Rudolph, his agent, went into the interior about the 1st of October, to look after defendant’s interests, and he then found the water in the tributaries of the Pascagoula so low that the logs were stranded, and could not be floated out. Knowing all these facts, defendant chartered the Urania and a number of other vessels, and undertook to load them. The master of the Urania, for all that appears, was in ignorance of the situation, and cannot be supposed to have contracted w'ith reference to a cargo of timber to be procured in the particular manner and from the special source intended by Keyser. The charter is silent on this point, as it does not provide from what source and in what manner cargo was to be obtained for the vessel. Presumably the execution of the charter in contemplation of the parties was to be governed by the custom of the port of loading. But the answer of the defendant does not aver what that custom is. From anything that appears in the pleadings, cargo was to be delivered from any port in the Gulf of Mexico. The evidence on this point simply show's that Keyser intended to load with logs out of his booms at Moss point after they had been delivered to him there.
*167 The contracts above referred to called for about 6,000 pieces of hewn timber and 5,000 round logs, to be cut and delivered out of the upper tributariés of the Pascagoula. In addition to this, the Wolf River Manufacturing Company agreed to sell 4,500 pieces of sawed timber; and the L. N. Danzler Lumber Company and Howe & Griffin, who had mills at Moss point, contracted to sell 14,000 pieces. The Wolf River Manufacturing Company never delivered any logs, and the other parties only a part of those contracted for. No doubt the drought was a cause of their failure. All these logs were to have been delivered in defendant’s boom, where they were to be sorted, put up in rafts, and towed to the vessel at Ship island. We take it, therefore, for the purposes of this case, that cargo for vessels loading at Ship island is customarily gathered together and stored at Moss point. Testifying on this point, F. H. Wilson, a witness for defendant, says that vessels at Ship island draw their cargoes from Moss point, and that Moss point is dependent on the Pascagoula river for its supply of timber. If defendant had had sufficient timber at Moss point, there would have been no difficulty in delivering it to the vessel at Ship island, so far as droughts were concerned.
These facts make a case similar to that of The India, decided at the first session of this court, reported in 2 U. S. App. 83, 1 C. C. A. 174, 49 Fed. Rep. 76. In that case, as in this, the charterers contracted to supply a cargo of timber at Ship island under a charter party containing a clause excluding from the computation of lay days at port of loading “any time lost by reason of quarantine, drought, flood, storms, strikes, fire,, or any extraordinary occurrence beyond the control of the shippers,” and the charterers contended in that case that they were prevented from obtaining a supply of timber, under contracts similar to this involved here, by the same drought. But this court decided, in a carefully prepared opinion delivered by Judge Locke, reviewing the case on principle and on authority, that the exclusion claimed could not apply to time lost by the charterers in failing to procure and have ready at the usual place of storage a cargo of timber on account of a drought which was prevailing before the charter of the ship, and which affected the rivers flowing through the country from which cargoes are ordinarily procured, but did not affect in any way the delivery of cargoes from the place of storage to the ship. After reargument and re-examination, we adhere to the principles declared in the case of The India. It follows that the libelants in this case are entitled to recover demurrage at the rate stipulated in the charter for 42 days. It is therefore ordered that the decree of the district court appealed from be and the same is hereby reversed; that this cause be remanded to the said district court, with instructions to enter a decree in favor of libelants for the sum of $4,087.44, and costs, together with the costs of this appeal.