JONASEN v. KEYSER et al.

KEYSER et al. v. JONASEN.

(Circuit Court of Appeals, Fifth Circuit. December 10, 1901.)

No. 1,034.

1. SHIPPING—DEMURRAGE—LAY DAYS—CONSTRUCTION OF CHARTER PARTY.

A provision in a charter made in Liverpool for the carrying of a cargo of timber from Ship Island, excluding from the computation of lay days at the port of loading "any time lost by reason of fire, droughts, floods, storms, strikes, lockouts, combinations of workmen, or any extraordinary occurrence beyond the control of the charterers," does not apply to time lost by reason of the charterers failing to have the cargo ready at the usual place of storage, on account of a drought which was prevailing at the time of the charter, and which affected the rivers by means of which the cargoes were ordinarily brought from the interior, but did not in any way affect the delivery of cargoes from the usual place of storage to the ship.

2. SAME.

A charter contained the following provision: "Demurrage to be paid for each working day beyond the days allowed for loading and discharging at fourpence per register ton per day, and the charterers may keep the ship on demurrage ten days." *Held*, that the last clause did not limit the time for which demurrage was recoverable, leaving the question of damages for a longer detention to be determined by evidence, but that the stipulated rate was recoverable for each working day beyond the lay days allowed, whether more or less than 10 days.[1]

Appeal from the District Court of the United States for the Southern District of Mississippi.

H. Pillins, for Jonasen.

Jno. C. Avery, for Keyser & Co.

Before PARDEE and SHELBY, Circuit Judges, and BOARMAN, District Judge.

BOARMAN, District Judge. The libelant, I. M. Jonasen, owner of the bark Ingomar, instituted his suit in admiralty in the Southern district of Mississippi, in personam, to recover demurrage, and damages in the nature of demurrage, upon a charter party under which he let the Ingomar to the charterers, the respondents, Keyser & Co. The ship was 1,182 tons, registered, or thereabouts, and was chartered January 17, 1899, at Liverpool, to sail in ballast to Pensacola or Ship Island, to take a cargo of pine timber, ¼ sawn and ¾ hewn, for a return voyage to Southampton, England. In the charter party appear the following stipulations (6, 7, and 9):

"(6) Twenty-three working days are to be allowed the said merchants in which to deliver the cargo at port of loading, which is understood to mean 'actual delivery of cargo alongside,' and not to complete loading. Said cargo to be discharged at such wharf, dock, or place as the charterers or their agents may direct, with the usual dispatch, according to custom of port of discharge; lay days not to begin until the ship is in a loading or discharging berth, respectively. (7) In the computation of the days allowed for delivering and receiving of the cargo shall be excluded any time lost by reason of fire, droughts, floods, storms, strikes, lockouts, combinations of workmen, or

---

[1] Demurrage, see note to Randall v. Sprague, 21 C. C. A. 337; Hagerman v. Norton, 46 C. C. A. 4.

any extraordinary occurrence beyond the control of the charterers or of the receivers of the cargo. (9) Demurrage to be paid for each working day, beyond the days allowed for loading and discharging, at fourpence per registered ton per day, and the charterers may keep the ship on demurrage ten days."

The libelant sues: First, for damages for the failure of respondents to furnish a ballast lighter within a reasonable time for the removal of ship's ballast, claiming a loss of 4 days' time, to be paid for per day, under article 9 of the charter party; second, for amount due on demurrage for 38 working days consumed beyond the lay days under stipulation in article 9 of the charter party, at fourpence per registered ton per day. The claim for 3 days is for $297.45. For the 38 days the claim is for $3,667.60.

Respondents set out at length in their answer a defense in which they deny all of libelant's claims for damages or demurrages. In this part of the answer they deny all liability for nondelivery of the cargo within the stipulated time, because they were relieved from compliance therewith by the prevalence of such a drought as is mentioned in article 7 of the charter party. That part of respondents' answer which denies liability for nondelivery within the time stipulated charges:

"That the said vessel was chartered, as the charter party indicates, and the master who chartered her to respondents well knew at the time, to participate in the very large foreign commerce of Ship Island and Pensacola, and other near-by ports and places, which consisted and consists almost exclusively of shipment abroad, by means of foreign vessels, of timber and lumber procured from the pine forests of the states bordering on the Gulf of Mexico. That the general course of the business constituting such commerce, as was and is well known to all shipowners participating therein with their ships, is, and for years has been, as follows: The merchants at the ports stand between the foreign buyers and the mill men, who saw timber and lumber from logs, and the contractors, who have timber hewn from the trees. The merchants make contracts with European buyers for pine lumber and hewn or sawn timber of specified dimensions and quality, and in stated quantities, to be carried from the Gulf ports where the merchants do business to ports designated in the foreign contracts of sale, by means of steam or sailing vessels to be chartered by the merchants for the purpose of such carriage. It is not customary for the merchants at such ports to keep on hand stocks of lumber and timber, and to make sales from stocks thereof on hand, but to contract for the same, to be furnished by the sawmill men and hewn-timber getters, for filling their contracts with European buyers. Inasmuch as the timber so contracted to be furnished by mill men and hewn-timber contractors is brought down to the sea by means of the rivers and streams, the contracts made therefor provide, for the benefit of the mill men and hewn-timber getters, for delivering as 'fast as waters will permit,' because the streams are often affected by droughts or floods, and the contracts of the merchants with the European buyers, having reference to the same conditions, also provide for exemption of the merchants from liability for 'nondelivery or delay' arising from 'droughts or floods'; and when the merchants charter ships to take the timber or lumber which they have contracted to sell and deliver at specified times, and they have bought for delivery to them at specified times, both transactions being subject to the drought and flood clause, they invariably secure the insertion, among the excepted causes of the charter, exemption from liability for delay in delivering cargo to the ship occasioned by 'droughts and floods'; and it is always understood by all persons engaged in such commerce that the said drought and flood clauses in contracts which the merchants make with foreign buyers, mill men, timber hewers, and shipowners relate to the same droughts and floods, and are intended to protect all persons participating in such commerce from

liability for time lost in getting timber down the rivers and streams by reason of excessive or insufficient rains to which the states bordering on the said Gulf are subject, and against the consequences of which it has for years been customary and necessary to guard all who make contracts for delivery of timber and lumber at stated times, and such clause is inserted solely for protection against delays on account of too much or too little water in the rivers and streams aforesaid. That the charter parties made for ships to carry timber and lumber from the Gulf ports are known as 'timber charters,' and have special provisions peculiar to the timber trade, and to meet the contingencies and exigencies thereof, among which is the clause exempting the charterer from liability for delay in delivering cargo occasioned by drought and floods; and what has above been, in this paragraph, set forth, constituted the custom of the business of the ports aforesaid, of which business charterers and shipowners constitute the center."

Libelant excepted to the part of the answer above stated "as being imperfect and insufficient so far as the same sets up said droughts in said river as an excuse for failure to supply said cargo, and shows that the same sets up no sufficient excuse for said defaults of respondents." The trial judge sustained the exceptions, with leave to the respondents to amend. Later the respondents amended, and the judge sustained libelant's further exception to the amended answer. Thereafter the controversy on the hearing was narrowed to four points: First, whether there was any, and how much, unreasonable delay in taking ballast from alongside of the ship; second, what, if any, days were lost by storms preventing delivery to the port of loading berth at Ship Island; third, assuming the vessel to have been detained more than 10 days over and above these lay days, whether libelant was entitled to receive demurrage therefor, or only damages as proven; and, fourth, what was the actual damage shown by the evidence? On considering these issues, the trial judge entered a decree responsive to all the issues, for "ten-days' strict demurrage," at $94 per day, amounting to $944, and 29 days' damages, at $38 per day, amounting to $1,102; total, $2,046.

The case is now before us on libelant's appeal and respondents' cross appeal, both of whom assign errors. Libelant's assignment challenges the conclusion and findings of the trial court: First. In not allowing damages against charterers for failure to furnish a ballast lighter in reasonable time. Second. In not allowing a greater sum against respondents than was adjudged in the decree for demurrage, and damages in the nature of demurrage. In this assignment is included the contention that the trial court erred in not allowing the stipulated demurrage or damages set out in article 9, for 38 working days, exclusive of lay days, and for 3 days' delay in not furnishing the lighter. The respondents assign as error: First. The court erred in sustaining libelant's exception to respondents' original and amended answer. Second. The court erred in rendering a decree in favor of libelant and against respondents in excess of the amount which under the evidence should have been awarded. This assignment seems, in a general way, to challenge the number of days for which the trial court allowed damages. Third. "The court erred in rendering a decree in favor of libelant against respondents in any amount whatsoever, because the exceptions filed by libelant to respondents' original answer and amendment thereto were, for the

purpose of said decree, true, and, being taken as true, presented legal defenses entitling them to a decree in said cause."

The first and second assignments of error by respondents will be considered in passing upon the assignments of error by libelant. As to the third assignment, we think the trial judge, in sustaining libelant's exception to respondents' answer and its amendment thereto, was abundantly sustained by the authorities. The merit of that part of respondents' answer upon which they rely for defense against all liability for nondelivery of the cargo, and which was successfully excepted to by libelant, was fully considered in The India, 1 C. C. A. 179, 49 Fed. 82, 2 U. S. App. 92, and in other cases,—notably, in the later cases in this court. Sorensen v. Keyser, 2 C. C. A. 92, 51 Fed. 30, and Sorensen v. Keyser, 2 C. C. A. 650, 52 Fed. 167. In this last case similar stipulations to those in the instant suit were under discussion. Judge Pardee, in discussing a similar defense to that to which the trial judge in this case sustained libelant's exception, said:

"These facts make a case similar to that of The India, decided at the first session of this court, reported in 2 U. S. App. 83, 1 C. C. A. 174, 49 Fed. 76. In that case, as in this, the charterers contracted to supply a cargo of timber at Ship Island under a charter party containing a clause excluding from the computation of lay days at port of loading 'any time lost by reason of quarantine, drought, flood, storms, strikes, fire, or any extraordinary occurrence beyond the control of the shippers'; and the charterers contended in that case that they were prevented from obtaining a supply of timber, under contracts similar to this involved here, by the same drought. But this court decided, in a carefully prepared opinion delivered by Judge Locke, reviewing the case on principle and on authority, that the exclusion claimed could not apply to time lost by the charterers in failing to procure and have ready at the usual place of storage a cargo of timber on account of a drought which was prevailing before the charter of the ship, and which affected the rivers flowing through the country from which cargoes are ordinarily procured, but did not affect in any way the delivery of cargoes from the place of storage to the ship. After reargument and re-examination, we adhere to the principles declared in the case of The India."

Libelant claims damages for three days because charterers neglected to furnish lighters for ballast removal. On this issue it appears that the charter party binds the respondents to furnish the ballast lighter for removal of ballast within a reasonable time after demand. In the record evidence on this issue we find nothing to satisfy us that the lighter, which seems to have been furnished at the end of six days, was not on hand within a reasonable time, under all the circumstances, and no allowance of damages on this claim should be allowed.

Conceding that the assignments of error on the part of the respondents are specific enough to authorize us to inquire into the issue as to the storm days, we think the court correctly found that the charterers are entitled to a credit of two days because of storms which prevented the delivery of the cargo.

Aside from the respondents' contention as to the meaning and legal effect of the words in the last line of article 9 of the charter party, with which contention we cannot agree, there is but little serious difference between counsel on either side as to the number of days for which demurrage, and damages in the nature of demurrages, should be allowed against the charterers. But there is much differ-

ence between them as to upon what basis the allowance should be made. The libelant contends that, the lay days for loading having expired, the true rule of compensation of the recovery which libelant is entitled to for the further delay occasioned by charterers' default in delivering cargo to the vessel is to give the demurrage explicitly named in the charter party; for thus, and not otherwise, have the parties contracted. The charter party declares that "demurrage" shall be paid for each working day beyond the days allowed for loading and discharging at fourpence per registered ton per day. Libelant contends that this language is without condition or exception, and should be applied in settling the allowances for all the days to be charged against charterers. Respondents contend that, if a ship is detained beyond her days of demurrage, prima facie the sum allowed as demurrage shall be taken as a measure of compensation. This rule is both of fitness and justice, he says, but it is upon the shipowner to show that more damages have been sustained, and for the freighter to show that there has been less than has been thus compensated. The district court characterized the 10 days mentioned in article 9 as strict demurrage days, and allowed for them at the rate provided for,—at fourpence per registered ton per day. The trial judge was in error, we think, in acting under the rule suggested by the counsel for respondents. He concluded the 10 days which he called "strict demurrage days" should be charged against the charterers at fourpence per ton per day, according to the stipulation in article 9, and he proceeded on the testimony of the captain of the ship to estimate damages for the 29 days independently of the stipulation in article 9. The trial judge held that:

"From the evidence of the captain of the ship can be ascertained the amount of damages the detention caused. He testifies that the vessel would make net on the trip $4,374; and we think that libelant is entitled to the amount shown by dividing this sum by the number of days it would take to make this trip, and multiplying by the number of days lost. The master testifies that it would take four or four and a half months to make this trip. At 30 days per month, this would be 135 days; and omitting Sundays, four for each month, and two holidays, the 4th of July and the 30th of May, we have 115 days; and by dividing 4,374 by 115 we have $38 as the amount lost per day by the ship."

This multiplied by 29 days amounts to $1,102.

Conceding that it was permissible for either side to offer evidence for the purposes suggested by respondents' counsel, notwithstanding the plain meaning of article 9 in the charter party, we do not think any reasonably accurate or satisfactory measure can be acquired under the trial judge's method of adjusting libelant's claim for damages for the 28 days which should be charged to the charterers. It may be that the trial judge was impressed, as we are, by the hardship imposed on the charterers in allowing such an excessive charge against them as $95.93 a day appears, under all the circumstances, to be, and that he was disposed, as we might be, to reduce the amount, if the plain provisions in article 9 could be legally construed so as to authorize a reduction or the allowance of a smaller sum per day as damages. But we think the price to be adjudged against the respondents is for demurrage, and not damages for every working day for which they were at fault in not delivering cargo, and the price itself

"is nominated in the bond." The demurrage for the 28 working days should be fixed at fourpence per registered ton per day, as the parties to the charter party have plainly stipulated in article 9. It follows that libelant in this case is entitled to recover demurrage at fourpence per registered ton per day on 1,182 tons for 38 days. The rate for demurrage fixed in the charter party will, in the absence of more satisfactory basis for estimating the demurrage, be taken as the basis upon which to estimate respondents' liability for the 38 days.

It is therefore ordered that the decree appealed from be amended so as to read:

This cause having been heard on the pleadings and proofs of the respective parties, and submitted on briefs of the proctors, it is ordered, adjudged, and decreed that libelant, I. M. Jonasen, recover herein against the respondents, W. S. Keyser and William Rudolph, composing the firm of W. S. Keyser & Co., the sum of three thousand six hundred and forty-one and 68/100 dollars ($3,641.68), with interest thereon at six per cent. from the 21st day of July, 1899, and costs to be taxed, for which let execution issue.

And as so amended the same is affirmed. All costs of appeal and cross appeal to be paid by W. S. Keyser & Co.