## TWEEDIE TRADING CO. v. PITCH PINE LUMBER CO.

### (District Court, S. D. New York. October 1, 1907.)

1. SHIPPING—CONTRACT OF AFFREIGHTMENT—COMMENCEMENT OF LAY DAYS FOR DISCHARGING—"ARRIVAL" OF VESSEL.

Under a clause in a bill of lading which entitles the ship to "commence discharging immediately upon arrival," her "arrival" dates from the time she actually reaches a berth where she can unload, provided there has been no delay on the part of the consignee in providing such berth, and the lay days for discharging commence to run from that time.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Shipping, § 592.]

2. SAME—DISCHARGING "CONTINUOUSLY"—"WORKING DAYS" DEFINED.

In a provision of a bill of lading which entitles the ship to discharge "continuously," the word must be construed to mean continuously during working days, and "working days" exclude Sundays and holidays usually observed, and include only the usual working hours of days on which usual work is only prevented by weather.

In Admiralty. On exceptions by both parties to commissioner's report on reference pursuant to decision reported in 146 Fed. 612.

Mr. Haight, for libelant.

Mr. Burlingham, for respondent.

HOUGH, District Judge. Of some of the arguments at bar, it is enough to say that the interlocutory decree entitles libelant to some demurrage, assessable against respondent as for a breach by it of the contract of carriage and of section 9 of the bill of lading (both set forth at length in the decision on the merits).

The exceptions filed, and the language of the instruments referred to, require consideration of two legal queries: (1) When does the laying time begin of a ship entitled "to commence discharging immediately upon arrival"? And (2) how is the laying time to be computed if the ship be entitled to "discharge continuously * * * any custom of the port to the contrary notwithstanding," and if the consignee is bound to receive cargo "as fast as steamer can deliver * * * working all hatches at once"?

The conduct of parties to a contract, contemporary with the execution or breach thereof, frequently waives some strict legal right or furnishes a rule of construction of the parties' own creation, and as binding upon them as any part of the contract itself. Perhaps this result occurs more frequently in contracts relating to shipping than in any other department of the law. But the testimony in this case is so fragmentary and unsatisfactory that in my opinion it offers no assistance in the construction of a somewhat unusual agreement.

1. "Arrival" must mean arrival at a place where discharge is possible. A loaded ship has not arrived at her destination in respect of the discharge of her cargo until she is where the work of unloading may be actually begun. Charterers and consignees frequently incur liability before that time, by neglecting or refusing to give the ship an opportunity to unload; but ordinarily the ship must first give formal notice of her readiness to proceed to an appropriate unloading place, and must actually go there when duly assigned, before her laying time

begins. And the burden of proving compliance with these requirements is on the ship. There is here no proof at all regarding notice by ship to consignee; but, as the vessel did go to a berth selected by consignees, it is inferable that before so doing notice was either given and acted upon or waived. The evidence warrants no more definite finding. Nor is there any evidence of delay caused by consignees in getting to a discharging berth, and it therefore results that September 5, 1905, at 8 a. m. (that being the day and hour when the Sangstad got to her berth), marks the moment after which she was entitled to discharge in compliance with the contracts first above referred to.

2. I know of no litigation arising out of an unloading clause providing for continuous discharge except Maclay v. Spillers, 6 Com. Cases, 217. The discussion there reported is not serviceable here; but the facts seem to me to show that it occurred neither to court nor counsel that "continuously" meant every hour of the 24 and every day of the week. Yet to that extent must the argument go if the word is to be taken literally. In my opinion the phrase must be interpreted with a reasonable regard for human weakness and human habits of alternating rest and work. This method of construction was adopted in Forest Steamship Co. v. Iberian Iron Ore Co., 5 Com. Cas. 83, regarding the singular phrase "working day of twenty-four hours." In like manner, the phrase "running days" was denied the meaning of consecutive days in Nielsen v. Wait, 16 Q. B. D. 77, while "forthwith" has been held to mean no more than without unreasonable delay. Hudson v. Hill, 43 L. J. C. P. 273. (Cf. Forest Oak Steam Shipping Co. v. Richard, 5 Com. Cases, 100, as to the meaning of the charter party words "proceed immediately.") I do not think there is any tenable ground between the literal (and impossible) meaning of the contract and holding that this vessel was entitled to discharge "continuously" during working days, and I therefore so hold. Clearly "working days" exclude Sundays, and holidays usually observed, and include days on which usual work is only prevented by weather (Sorensen v. Keyser, 52 Fed. 163, 2 C. C. A. 650; Holman v. Peruvian Nitrate Co., 5 Sess. Cas. [4th Ser.] 657); and a holiday is one created by general acceptance and observance, to which dignity it may arrive without the aid of statute law, e. g., the Welsh Eisteddfod (Deniston & Co. v. Zinmerman, 11 L. T. R. 113).

Before these legal rules can be applied to the case at bar, the question of fact must be settled: How much lumber was the Sangstad entitled to discharge per working day with the work proceeding "as fast as she could deliver * * * working all hatches at once"? To this point the evidence submitted has been directed, and in my opinion it is nearly all guesswork. The estimates range from 200,000 feet per diem to more than twice that amount, and the direct evidence regarding one extreme is as untrustworthy as that regarding the other. I think the matter is controlled by a few facts concerning which there is no contradiction. It is admitted that there was delay at Buenos Ayres in unloading this cargo; the fact of that delay was observed and reported by the libelant's agents in that port; it is to be presumed that they were quite as well informed regarding the steamship's rights and possibilities as the court can be at the distance of so many months

and miles; and these agents fixed the rate of desired discharge at 200,-000 feet per Buenos Ayres' working day.

The action of these agents is, of course, not conclusive upon the libelant, but all the testimony does not disturb the presumption of fact that these men, interested to get as much demurrage as they could, were right in fixing that amount. I accordingly hold that the Sangstad was entitled to discharge at the rate of not less than 200,000 feet per working day of eight hours, and that the only permissible interruptions were Sundays and holidays, and not rainy days.

There will be filed with this opinion a computation based upon it. Unless error therein is discovered, a final decree will be entered in accordance therewith, and the commissioner's report modified accordingly.