HAIGH HALL STEAMSHIP COMPANY, LIMITED, *vs.* CHRISTIAN P. ANDERSEN.

Suffolk.    January 9, 1923. — June 21, 1923.

Present: RUGG, C.J., BRALEY, DECOURCY, CROSBY, & CARROLL, JJ.

*Contract*, Construction, Performance and breach.  *Sale.*

A contract in writing between a coal merchant and a shipowner required the merchant to furnish the shipowner's ships with Pocahontas or New River coal at Boston at a certain price per ton and contained the following clause: " In the event of the Act of God, Fire, Ice, War, Hostilities, Government Objections, Restrictions, and/or Prohibitions, Pirates, Arrest and Restraint of Princes, Rulers and People, Insurrection, Riots, Epidemic, Quarantine, Perils of the Sea, Accidents, Shortage of Railway Trucks, Obstruction of Mines, Chutes, Rivers, Docks, Strikes, Lockouts, Stoppage of Pitmen or Workmen, whether general or partial, and whether on Railways, Docks or elsewhere at home or abroad, or other hindrances, of any kind whatsoever beyond the control of suppliers affecting the normal working of this Contract, or should the country in which the place of coaling is situated be engaged in war, the Suppliers during the continuance of such events and until normal

conditions again prevail to be relieved from all obligations under the same unless modified by mutual agreement." The contract made no reference to the sources from which or the means by which the defendant expected to procure his supply of coal. *Held,* that

(1) The "other hindrances" to which the excusing clause referred were those "affecting the normal working of this Contract," that is to say, the contract between the plaintiff and the defendant as to supplying coal to ships at Boston, and did not include causes remotely and indirectly touching one party or the other in respect to the general subject but not operative upon the contract save in a secondary degree;

(2) Under the clause above quoted, performance by the merchant was not excused merely by reason of a rise in freight rates between Hampton Roads and Boston or a shortage of vessels to carry coal from Hampton Roads to Boston;

(3) A hindrance which could have affected the normal working of the contract merely by causing the merchant a loss would not excuse him from performance.

CONTRACT for damages resulting from an alleged breach of a contract in writing by the defendant to supply vessels of the plaintiff with Pocahontas or New River coal at Boston. Writ dated December 18, 1916.

In the Superior Court, the action was heard by *Morton,* J., without a jury, upon a statement of agreed facts and other evidence.

Clause 4 of the contract, referred to in the opinion, was as follows: " 4. Should the general current price for bunker coals as contracted for herein delivered to steamers at port of supply be below those herein named on day of coaling Buyers to have benefit of such lower price."

Other material evidence is described in the opinion. The record states: " None of the facts [excepting two not material upon the point of law here involved] were in dispute."

The trial judge ruled " that on the undisputed facts in the case the defendant was, under clause 6 of the contract, excused from furnishing coal to the plaintiff in the circumstances;" found for the defendant, and, at the request of the plaintiff, reported the action to this court, it being agreed by the parties that, if the ruling was right, judgment was to be entered for the defendant; otherwise, judgment was to be entered for the plaintiff in the sum of $770 with interest from May 2, 1916.

*G. P. Wardner,* for the plaintiff.

*A. T. Smith,* for the defendant.

RUGG, C.J.   The plaintiff seeks to recover damages in this action for alleged breach of contract to supply coal. The defendant through his agent in London entered into a contract with the agent of the plaintiff on December 18, 1915, to supply vessels of the plaintiff with Pocahontas or New River coal at Boston from the first of January to the thirty-first of December, 1916, at $4.35 per ton.   Demand was made on the defendant to furnish coal for the steamship Haigh Hall during April, 1916, and he refused.   Coal to the amount of five hundred and fifty tons was bought at an advanced price of another Boston dealer.   This action is brought to recover the difference between the cost and the contract price.

It is the contention of the defendant that he is relieved from obligation to furnish coal by reason of clause 6 of the contract, which is in these words: " In the event of the Act of God, Fire, Ice, War, Hostilities, Government Objections, Restrictions, and/or Prohibitions, Pirates, Arrest and Restraint of Princes, Rulers and People, Insurrection, Riots, Epidemic, Quarantine, Perils of the Sea, Accidents, Shortage of Railway Trucks, Obstruction of Mines, Chutes, Rivers, Docks, Strikes, Lockouts, Stoppage of Pitmen or Workmen, whether general or partial, and whether on Railways, Docks or elsewhere at home or abroad, or other hindrances, of any kind whatsoever beyond the control of suppliers affecting the normal working of this Contract, or should the country in which the place of coaling is situated be engaged in war, the Suppliers during the continuance of such events and until normal conditions again prevail to be relieved from all obligations under the same unless modified by mutual agreement."

The agreed facts were that " The only way to bring New River and Pocahontas coal to Boston is water transportation from Hampton Roads.

" The price of such coal f.o.b. Hampton Roads during 1915 was $2.70 to $2.85 per gross ton; during the first four months of 1916, $2.85 to $3.00 per gross ton.

" During the year 1915 freight rates from Hampton Roads to Boston on bituminous coal in cargo lots were approximately $.75 to $1.00 per gross ton, and tonnage was freely obtainable at these rates until the latter part of November, 1915, when the rates began to rise; by the latter part of December, 1915, freight rates on bituminous coal went up to $2.50 per gross ton; and during January, 1916, they were $3.00 per gross ton; during February, March and April, 1916, they were $2.00 to $2.50 per gross ton.

" Coal is carried by water during normal times, from Hampton Roads to Boston only by steamers, sailing vessels and barges.  Of the coastwise coal carried by this tonnage sailing vessels normally carried a large part, probably more than half.

" A large part of all sailing vessels and steamers usually engaged in carrying coal coastwise were under charter from January 1st, 1916, to April 1st, 1916, for foreign business. That left, as available tonnage, during the period from January 1st, 1916, to April 1st, 1916, from Hampton Roads to Boston, said barges, some of said steamers and a few of said sailing vessels."

The defendant testified that on March 24, 1916, he received notice that the steamship was due in Boston about April 20, 1916, and would require coal; that he had contracts with several hundred steamers, and that probably one in five might come to Boston and " they might want coal or might not; " that there was no volume of business because ships were not coming to Boston at that time to any extent; that at the time in question he did not have any New River or Pocahontas coal in his possession and was unable to procure any.

The judge ruled that on the undisputed facts the defendant was excused by clause 6 of the contract and found for the defendant.  The only question of law to be decided is the correctness of that ruling.

More specifically, the contention of the defendant is that the shortage of shipping and means of transportation and the increase in cost of such transportation fall within the descriptive words of the contract, " other hindrances, of

any kind whatsoever beyond the control of suppliers [the defendant] affecting the normal working of this Contract," whereby he was relieved of all obligation under the contract " during the continuance of such events and until normal conditions again prevail."

We are of opinion that the defendant does not bring himself as matter of law on the undisputed facts within the terms of the contract as to relief from its performance. The " other hindrances " to which the excusing clause refers are those " affecting the normal working of this Contract," that is to say, the contract between the plaintiff and the defendant as to supplying coal to ships at Boston. These " hindrances " as matter of construction mean those which directly and proximately relate to the normal working of that particular contract. The word does not include causes remotely and indirectly touching one party or the other in respect to the general subject but not operative upon the contract save in a secondary degree.

It is not quite clear what the hindrance is upon which chief reliance is placed. If it is the mere rise in freight rates between Hampton Roads and Boston, that hardly comes within the descriptive words of the contract. If " hindrances " can have that scope, the contract would have little if any force. Its performance would rest on commercial convenience and profit and carry slight obligation. If the " hindrance " relied upon by the defendant be the shortage of vessels to carry coal from Hampton Roads to Boston, that was not directly related to the normal working of the contract to coal ships putting into the port of Boston. That hindrance bore directly on other contracts which the defendant might make, or desire to make, or be able to make with other people in order to be in position to perform his contract with the plaintiff. But the contract did not relieve the defendant from liability due to hindrances of that nature. If it had been the intention of the parties to screen the defendant from liability because of hindrances beyond his control preventing him from procuring coal with which to be in a position to perform his part of the contract, it would have been simple to have expressed that purpose in apt

words.   See for example *Tennants, Ltd.* v. *C. S. Wilson & Co. Ltd.* [1917] A. C. 495.   The contract between the plaintiff and defendant makes no reference to the sources from which or the means by which the defendant expected to procure his supply of coal.

Moreover, the agreed facts and evidence fall short of showing that transportation could not have been had at the advanced rate.

Any hindrance, founded upon the undisputed facts, cannot be said to have affected the normal working of the contract here in suit in any other way than by causing the defendant a loss.   That alone cannot be said to have been a hindrance. The provision in clause 4 of the contract giving the ship-owner the benefit of a lower general current price than that stipulated in the contract, if prevailing at port of supply on date of delivery, carries the implication that the defendant was to bear the loss of a rise in such general current price.

The other events which by clause 6 excuse performance of the contract by the defendant are physical or governmental in nature.   The hindrance now relied upon is of a different kind.   *Ellery* v. *New England Ins. Co.* 8 Pick. 14.   *Swift* v. *Union Mutual Marine Ins. Co.* 122 Mass. 573, 575.

These factors grouped together fail to establish as matter of law a valid ground of defence.   While no two cases are precisely alike, the case at bar is somewhat similar in principle and facts to several arising in other jurisdictions.   *Pacific Sheet Metal Works* v. *California Canneries Co.* 91 C. C. A. 108.   *Crawford* v. *Wilson Sons & Co.* 1 Com. Cas. 277. *Blythe & Co.* v. *Richards, Turpin & Co.* 114 L. T. Rep. 753. *The India,* 1 C. C. A. 174.   *Sueton D. Grant & Co.* v. *Coverdale, Todd & Co.* 9 App. Cas. 470.

In accordance with the terms of the report the entry may be, judgment for plaintiff in the sum of $770 with interest from May 2, 1916.

*So ordered.*